**REGAL WARE, INC., Appellant,**

v.

**FIDELITY CORPORATION and American Foresight, Inc., Appellees.**

**No. 75–1219.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 12, 1975.

Decided Jan. 11, 1977.

Israel Steingold, Richmond, Va. (Jeffrey M. Steingold, Richmond, Va., on brief), for appellant.

Richard A. Repp, Richmond, Va. (Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., on brief), for appellees.

Before WINTER, CRAVEN and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

In this diversity case, appellant, Regal Ware, Inc., a Wisconsin corporation, sued Fidelity Corporation (hereafter Fidelity) and American Foresight, Inc., both Virginia corporations, in the United States District Court for the Eastern District of Virginia. The district court entered judgment against American Foresight in the amount of $210,-571.96, with interest from July 3, 1973 until paid, but dismissed Regal Ware's suit against Fidelity Corporation. American Foresight, an insolvent and largely liquidated corporation, has not appealed from the judgment against it. The amount owing is not in dispute. Regal Ware has appealed from the dismissal of its suit against Fidelity Corporation. We vacate and remand.

## I(A)

Appellant, Regal Ware, is engaged in the business of manufacturing kitchen ware. American Foresight was engaged in the business of selling kitchen ware and similar items, at retail, primarily on credit. The present suit is for goods purchased for resale on open account by American Foresight from Regal Ware, largely during the months of June, July, and August 1972, and is for the amount still owing to Regal Ware on account of said purchases.

## (B)

From around 1965 until June of 1970, Regal Ware did business with a predecessor of American Foresight, a Delaware corporation, also known as American Foresight (hereafter Delaware American Foresight). Its principal place of business was in Philadelphia. The two principal stockholders and officers of Delaware American Foresight were Edward M. Satell, President, and William C. Beery, Chairman of the Board of Directors. Satell was the principal manager of the corporation, and Beery was, in actual practice, subordinate to Satell.

By 1969 or 1970, Delaware American Foresight, on account of purchases of goods for resale, was indebted to Regal Ware in an amount around $145,000. Because of the amount of this indebtedness, Regal Ware limited the credit of Delaware American Foresight to $50,000 and worked out an arrangement under which the debt would be liquidated over a period extending through 1971.

In May and June of 1970, a radical reorganization occurred. All of the assets and liabilities of Delaware American Foresight

were transferred to American Foresight, a Virginia corporation [1] (hereafter Virginia American Foresight), one of the defendants in this case. The sole owner of all the capital stock of Virginia American Foresight was Fidelity Corporation,[2] the appellee herein.

Fidelity Corporation (Fidelity) is a Virginia corporation with headquarters in Richmond, Virginia. It is strictly a holding company, which owns the stock of around 30 operating companies, such as Virginia Foresight, and several other subordinate holding companies. Most, but not all, of the companies owned by Fidelity are financial or insurance institutions.

The reason Fidelity desired to acquire Delaware American Foresight [3] was to avail itself of a distinctive method of marketing. Delaware American Foresight had been in the practice of marketing its product primarily by the use of college students during the summer months. It had an arrangement with the students which was very attractive from their point of view. Since a number of the subsidiaries of Fidelity were in the insurance field, and since a number of the customers of these subsidiary insurance companies were college students, Fidelity believed that the Foresight sales personnel could be trained and worked into the sale of insurance. Especially, it was hoped that some of these summertime salesmen would accept regular sales assignments with various of Fidelity's insurance subsidiaries when they completed college. The district court judicially noticed, and it was stipulated, that Fidelity knew of the financial condition of Delaware American Foresight at the time of the acquisition. In payment for the assets of Delaware American Foresight, Fidelity delivered to the stockholders of that company, principally Edward M. Satell and William C. Beery, 18,000 shares of Fidelity stock. An additional 190,000 shares were placed in escrow to be delivered to the same parties over a period of five years as specified earning standards were attained. The operation and management of Virginia American Foresight was placed by Fidelity, for the time being, in the hands of Satell and Beery,[4] thus remaining as it had been under the Delaware corporation.

After the events of May and June 1970, the fact that Delaware American Foresight had been acquired by Fidelity was made known to Regal Ware by Satell. As a result of that acquisition, the credit limitation which Regal Ware had previously placed upon Delaware American Foresight was removed. Regal Ware admitted, however, that Fidelity did not guarantee the accounts of Virginia American Foresight, and it is not contested that Fidelity did nothing to justify a belief that it would be responsible for those accounts as a guarantor or security or the like.

1. The principal office continued to be in Philadelphia.

2. Formally, the stock of Foresight was owned by either Drum International, a Virginia corporation, or Drum International, a Delaware corporation. The stock of both of the Drum corporations was owned completely by Fidelity Corporation. The record is not clear as to which Drum International owned the stock of Foresight. The matter is of no consequence because all significant decisions regarding Foresight were made by officers of Fidelity Corporation. There is no argument that, for all purposes relevant here, Fidelity was the owner of all the stock in Virginia American Foresight.

3. The transition from Delaware American Foresight to the present Virginia American Foresight was somewhat more elaborate than stated. A Virginia corporation, AF, Inc., was created by Drum International, actually Fidelity.

By agreement of May 26, 1970, all the assets of Delaware American Foresight were conveyed to AF, Inc., which assumed all the liabilities of the Delaware company. This agreement was participated in by Fidelity, AF, Inc., Delaware American Foresight and Edward M. Satell and William C. Beery, the principal stockholders of Delaware American Foresight. Subsequent to the sale the name of AF, Inc., was changed to American Foresight, a Virginia corporation, the present Virginia Foresight.

4. Satell and Beery also entered into employment contracts with AF, Inc., on June 26, 1970. The compensation was to be the same as they had received from Delaware American Foresight. In a later suit filed, that compensation was alleged to be $43,000 per year for each, plus certain pension contributions.

Prior to its acquisition by Fidelity, Delaware American Foresight had created a subsidiary by the name of East Coast Associates (hereafter East Coast).[5] East Coast was incorporated in Massachusetts and its principal place of business was in Boston. Later, the office of East Coast was moved to Philadelphia, and still later to a part of the same building which housed the head office of Foresight (both Delaware and later Virginia American Foresight) and adjacent thereto. After Virginia American Foresight acquired the property of Delaware American Foresight, East Coast continued as a wholly owned subsidiary of Virginia American Foresight.

East Coast was, in effect, a financing and collecting agency for Virginia American Foresight (references to Foresight after this point are to Virginia American Foresight unless otherwise indicated). Most of Foresight's sales were on a credit basis, and the paper generated by that company was sold to East Coast. The capitalization of both Foresight and East Coast was nominal. In order that East Coast would have money to buy the paper produced by Foresight, Fidelity arranged for a loan of $800,000 from Fidelity Bankers Life Insurance Company, another subsidiary of Fidelity.[6] Later Fidelity arranged additional credit of $1,500,000 with two New York banks[7] which Fidelity guaranteed. Also, the $800,000 loan from Fidelity Bankers Life Insurance Company was subordinated to the loans by the two New York banks.

Immediately following the acquisition by Fidelity, the former management remained in control of Foresight and East Coast.[8] The board of directors of Foresight consisted of six: Edward M. Satell, William C. Beery and Albert W. Schiffrin (who had acted as attorney for Satell and Beery), Albert L. Hobbs, Richard H. Guilford and Edward D. Simon. The three latter named directors were representatives of Fidelity. Satell was President and Beery was Chairman of the Board and Secretary-Treasurer. The directors of East Coast were Satell, Beery and Schiffrin; Satell was President and Beery was Clerk and Treasurer. Joseph M. Mizelle, an employee of Fidelity, acted as liaison officer between Fidelity and Foresight.

By December 1971, Foresight had liquidated its former debt to Regal Ware.

## II

By February 1972, tension had developed between Satell and Beery, and the management of Fidelity.[9] On February 10, 1972, Fidelity, as sole stockholder of Foresight, amended the bylaws to increase the size of the board of directors of Foresight from six to eight. Alan G. Fleischer and Joseph M. Mizelle[10] were added as directors, thereby giving Fidelity at least a five to three control on the board of Foresight. On March 3, 1972, the new board of Foresight increased the board of directors of East Coast from three to nine, adding six Fidelity ori-

5. We were told at oral argument that the stock ownership of East Coast may have been more diverse prior to its acquisition by Fidelity. Even if so, this would not bear on our decision, for at all times pertinent here East Coast may be considered a wholly owned subsidiary of Virginia American Foresight which acquired the East Coast stock as an asset of Delaware American Foresight.

6. Previously, the function of providing credit for East Coast was performed by an independent factor, Talcott, Inc.

7. First National City Bank, New York City, and Security National Bank, Melville, New York, each provided credit for East Coast in the amount of $750,000.

8. Representatives of Fidelity testified that it was the general policy of that holding company to keep the management of its various subsidiaries autonomous.

9. The exact cause for the tension is not clear from the record. There is a suggestion that it may have been because of the practice of "upstreaming" by Foresight (see text at footnote 17, infra). However, some of the witnesses on behalf of Fidelity testified that that company was not aware of the upstreaming practice until the summer of 1972.

10. Mizelle was already serving as liaison officer between Fidelity and Foresight.

ented directors.[11] Also, Richard J. Maccarone [12] replaced Satell as President and chief executive officer of East Coast and Charles D. Robinson replaced Beery as clerk.

On April 3, 1972, the board of directors of Foresight met and enacted the following resolution:

"RESOLVED: That a dividend of $53.942 per share consisting of advances receivable from Edward M. Satell amounting to $36,536 and William C. Beery in the amount of $17,406, a total of $53,942, is hereby declared out of capital surplus on the Common Stock of this Company payable on April 7, 1972 to stockholders of record at the close of business on April 3, 1972."

Satell, Beery and Schiffrin did not participate in the meeting of April 3rd, but Schiffrin wrote a letter on behalf of Satell, Beery and himself objecting to the legality of said action. As requested, the letter was attached to the minutes.

The explanation given for this dividend, or assignment, as stated by Charles D. Robinson, Senior Vice-President and Secretary of Fidelity, follows:

"It [the dividend] was largely on the advice of counsel in that it was an assessment of American Foresight representing money due it by Messrs. Satell and Beery, an amount that had been due at the time the business was acquired almost two years previously. It had been unchanged in amount. We were beginning to get concerned about these two gentlemen and whether in some manner the assets might be satisfied in an improper manner. We felt that to preserve this asset, that it should be passed up through Drum International to Fidelity Corporation. . .

The dividend consisted specifically of this asset."

The district court made no finding as to the business judgment of the action taken by Fidelity on April 3, 1972, or of whether its mistrust of Satell and Beery was justified, but found that the taking of the action was based upon the belief that such was necessary to protect this asset of Foresight. Fidelity, said the district court, took this action "obviously for its own ultimate benefit, but also for the benefit of other creditors." [13]

Alan G. Fleischer, an attorney at law and a member of the Board of Directors of Foresight which voted the April 3, 1972 dividend,[14] testified that he considered the dividend legal because Foresight was not insolvent at the time it was voted. The district judge made no finding as to the solvency of Foresight at the time of said dividend. Richard T. Guilford, Executive Vice-President of Fidelity, testified that Foresight was solvent at that time if $200,-000,[15] allocated to good will, could be considered. Otherwise, at that time the assets of the company were $2,161,629, whereas the liabilities were $2,322,335. There is testimony that the so-called "good will" of a company is a fictitious amount added to the assets of a company in order to make the value of property actually obtained correspond to its book value. The district court considered it "isn't worth much" in finding Foresight insolvent in September 1972, and there is no indication the good will had any value in April.

Actually, these obligations of Satell and Beery, assigned to Fidelity, were used by that company in settling claims made by them in litigation with Fidelity and Fore-

---

11. Alan G. Fleischer, Richard H. Guilford, Albert L. Hobbs, Richard J. Maccarone, Joseph M. Mizelle and Edward D. Simon.

12. Maccarone may be regarded as Fidelity oriented by this time, although he had been an employee of Delaware American Foresight before the acquisition by Fidelity.

13. Quotation is from the opinion of the district court from the bench.

14. Fleischer was a member of the firm of Fleischer and Fleischer, which was general counsel for Fidelity, and was a member of the board of directors of Fidelity as well as that of Foresight.

15. The book value of good will was $282,166.

sight during the final liquidation of Foresight. This aspect of the case is discussed more fully infra.[16]

### III

During the months of June, July, and August 1972, a debt of $210,571.96 (the amount of the judgment entered by the district court) from Foresight. to Regal Ware was built up. This sum makes allowances for unsold goods returned to Regal Ware. Terms of sales from Regal Ware to Foresight were 90 days during the summer and 30 days thereafter. Although payments were made from time to time, additional credit was extended. The first Regal Ware knew that it could not expect payment in full was when Fidelity offered a 20 percent settlement to all the creditors of Foresight. Regal Ware declined the offer.

During the summer of 1972, the state of tension between Foresight, as represented by Satell and Beery, and Fidelity worsened. The loan agreements between the two New York banks and East Coast provided that no funds obtained by said loans should be paid to Foresight except in exchange for accounts receivable from Foresight resulting from sales of its products. In the summer of 1972, officers of Fidelity learned that East Coast had been forwarding funds to Foresight for which no receivables were transferred. This was called "upstreaming".[17] The amount of money transferred to Foresight by this practice does not appear from the record.

It does appear that Foresight or East Coast, or both, applied to Fidelity and received from that company assistance in receiving additional credit during the summer of 1972. The loans were made to East Coast but Foresight was required to guarantee them. Several witnesses placed the

amount around $400,000 and one witness [18] placed the amount at $409,116. The record is not clear as to what, if any, connection there was between the upstreaming practice and these additional 1972 loans. The two subjects seem to be intermingled in the testimony of the witnesses.

Five significant events occurred during the fall of 1972: on September 6th, September 18th, September 19th, September 21st, and November 1st.

There was considerable discussion about the solvency of Foresight on September 6th, the date of the first of them. The district court found that Foresight was insolvent on that date, and we concur in that finding.

At a meeting of the Board of Directors of Foresight on September 6, 1972, the following resolutions were adopted:

"RESOLVED: That the Board of Directors of American Foresight, Inc. hereby directs the President of East Coast Associates, Inc. not to use East Coast funds for other than payment of interest on debt or East Coast operating expense except advances to American Foresight, Inc. approved by Mr. Mizelle.

"RESOLVED: That the Board of Directors of American Foresight, Inc. hereby directs the President of East Coast Associates, Inc. to assign its accounts receivable to Fidelity Corporation, or its designated affiliates, as collateral to secure indebtedness to Fidelity Corporation and its affiliates in connection with East Coast Associates' indebtedness."

Satell voted against the resolutions, Schiffrin abstained,.and Beery was absent.

On September 18, 1972, Edward D. Simon, Vice-President of Foresight, executed in the name of that company a sale, assignment and transfer of all its accounts receivable to East Coast.[19] The evidence shows

---

**16.** See text at footnote 4, and the footnote, and text at footnotes 30 and 33, infra.

**17.** See footnote 9, supra. There is some reason to believe that knowledge, or at least suspicion, of the upstreaming came to Fidelity's attention as early as February of 1972.

**18.** Joseph M. Mizelle, liaison officer between Fidelity and Foresight and soon to replace Satell as president of Foresight.

**19.** The exact wording of said instrument is: "For value received, AMERICAN FORESIGHT, INC. hereby sells, assigns, and transfers to EAST COAST ASSOCIATES, INC. the accounts, and all instruments evidencing same,

no resolution of the Board of Directors authorizing this assignment. The instrument was signed by the Vice-President, although Satell was still President.

It is stipulated that "[b]y instrument dated 19 September 1972, between East Coast Associates, Inc., assignor, Fidelity Bankers Life Insurance Company,[20] lender, and Fidelity Corporation, guarantor (collectively called 'assignee'), East Coast Associates assigned its accounts receivable to Fidelity Corporation and to Fidelity Bankers Life Insurance Company."[21] The designation of the accounts involved was identical to that covered by the September 18 assignment by Foresight to East Coast.[22] It is expressly

evident that the purpose of this transaction was to secure Fidelity against loss on the $800,000 subordinated loan and against its liability as guarantor on the two $750,000 loans. No reference was made to the additional $409,116 lines of credit established in the summer of 1972.[23]

On September 21, 1972, another meeting of the Board of Directors of Foresight was held. At that meeting, Foresight's directors were advised that Fidelity would neither provide nor guarantee the money or credit necessary to enable Satell and Beery to continue operating Foresight. The meeting was continued to a future date to see if Satell and Beery could provide alternate plans for financing.[24]

set forth on Schedule A attached hereto and by this reference made a part hereof, and hereby certifies and guarantees that said undersigned has proper legal authority to make said sale, assignment, and transfer; that full delivery has been made of the property covered by said accounts and instruments; that the balances due thereon are net and not disputed by the account debtors, and that there are no set-offs or counterclaims whatsoever against payment thereof.

"The undersigned agrees that entries disclosing this absolute sale will be made immediately on the books of the undersigned.

"Dated this 18 day of Sept., 1972
AMERICAN FORESIGHT, INC.
By Edward D. Simon (signed)
Vice President
SCHEDULE A

"All rights to payment due on outstanding accounts or general intangibles evidenced by retail installment sale agreements arising out of solicitation sales of merchandise by American Foresight, Inc., its employees, agents, representatives, affiliates, or subsidiaries, made between June 1, 1967, and September 14, 1972, and designated as East Coast Associates, Inc., File Numbers 20 to 23599, inclusive."

**20.** Wholly owned by Fidelity. This is the corporation that made the $800,000 loan to East Coast later subordinated to those of the New York banks.

**21.** The essence of the instrument is found in the first paragraph which provides as follows:
"1. *Assignment of Instruments.* The Assignor hereby grants, for such period of time as its primary obligation on the aforesaid notes or any future notes or any other indebtedness to Assignee shall be unpaid, a security interest in, and assigns to Assignee as collateral security for the payment of the Assignor's liability to Lender, and Guarantor, and to save harmless Guarantor from any payment

that might have to be made by reason of its endorsement as aforesaid, or to reimburse Guarantor for any such payment already made, all rights to payment due to Assignor upon the accounts, and instruments evidencing same, shown on Schedule A hereto annexed, all of its rights thereunder against any person or other entity from whom said accounts or instruments were acquired, all securities or guaranties held by Assignor in respect of such accounts and instruments, and all proceeds thereof. Assignor further agrees to transfer immediately upon signing this agreement to the agent designated by Assignee the original executed instruments evidencing said indebtedness."

**22.** In both instruments reference is made to Schedule A which covers "outstanding accounts or general intangibles evidenced by retail installment sale agreements arising out of solicitation sales of merchandise by American Foresight, Inc. . . . made between June 1, 1969, and September 14, 1972, and designated as East Coast Associates, Inc., File Numbers 20 to 23599, inclusive."

**23.** See text at footnote 18, supra.

**24.** The minutes of the meeting recite:
"The former minutes of the meeting of September 6 were approved as circulated. The board then reviewed financial projections submitted by management and were advised that about $200,000 in cash was required to operate for the balance of 1972, and that about $400,000 in cash was necessary for 1973, but that in 1974 the company would have a positive cash flow. These projections were not agreed to by all present. The situation was reviewed and discussed, and management was then advised that Fidelity would not provide any additional funds or

After the September 21st meeting, Satell and Beery informed Regal Ware of the difficulty that had developed. That was Regal Ware's first knowledge that its account might not be paid in full. At that time Satell and Beery spoke of various possibilities for refinancing Foresight, including the possibility that Regal Ware might take over Foresight. Regal Ware was sufficiently interested to send a representative to investigate. However, it decided against acquiring Foresight, a part of the reason being that Regal Ware marketed its product through various retail companies such as Foresight. The managers of Regal Ware considered that it would not be good policy for that company to compete with its customers. The first that Regal Ware knew for sure that it would not receive full payment was in late November 1972, when Fidelity offered to discharge all claims against Foresight by paying 20 percent. Regal Ware rejected that offer.

Regal Ware's claims against Foresight, which developed during the summer of 1972, were due in 90 days. The reason Regal Ware was not paid in the fall of 1972, after the accounts became due, was that after September 18th and 19th there was no money in Foresight with which to pay them. Satell testified that if Foresight had received cash from East Coast for all the accounts receivable which were transferred, it could have paid appellant.

The evidence is somewhat confused as to whether cash was then paid, or had been previously paid, by East Coast to Foresight for the accounts receivable which were assigned on September 18th. Mizelle, representing Fidelity, testified that cash was paid. However, Satell testified to the contrary. His version was that the assigned accounts were used to offset amounts which Foresight owed to East Coast because of the previous upstreaming.[25] The finding of the district court supports the conclusion that the assignment of September 18th was applied against debts by Foresight to East Coast and that cash was not paid for that assignment. The evidence does show that East Coast continued to buy accounts receivable from Foresight after the September 18th and 19th assignments, and that such sales were paid for in cash.[26] However, the September 6th resolution by the Foresight Board of Directors forbade East Coast payments to Foresight unless "approved in writing by Mr. Mizelle." We conclude that only payments to be used for current operating expenses, particularly the compensations for the student salesmen, were approved, and not transfers of funds to be used to pay creditors, such as Regal Ware.

On November 1, 1972, the Board of Directors of Foresight adopted the following resolution:

"RESOLVED: That the proper officers are hereby authorized, empowered, and directed to do all things necessary and requisite to wind up and settle the affairs of the Company, to collect the outstand-

credit to the company. Management advised they had no alternative plans as to how to continue the operations under the circumstances. At this point it was agreed to recess the meeting until further notice so management could consider various courses of action that might be available to them."
By "management," reference was to Satell and Beery.

25. Incidentally, Satell contended that upstreaming was legitimate if not in excess of $800,000. The reason for that belief was that upstreaming was not forbidden in connection with the loan by Fidelity Bankers Life Insurance Company, but only in connection with the loans by the two New York banks. That view seems quite logical. If Foresight could obtain no funds until it had receivables to sell to East

Coast, how could it operate at the outset? It must be that there was no objection to upstreaming funds obtained by East Coast from the $800,000 subordinated loan by Fidelity Bankers Life Insurance Company. In fact, Satell testified that the decision was left to him as to whether the $800,000 loan should be made to Foresight or East Coast. If Foresight could not have gotten any of the proceeds of the loan before sales were made, it is logical the loan would have been taken in the name of that company.

26. Payment was made by what was called "wire transfers" of funds from East Coast's bank to Foresight's bank. $123,891.82 was so transferred during September of 1972 and $127,115.73 during October.

ing debts and to provide for the payment of the obligations of the Company."

Satell and Beery voted against the resolution and then immediately left the meeting. At that same meeting, the following action was taken with the written consent of Drum International, Inc., the sole stockholder: [27]

"RESOLVED: That Edward M. Satell and William C. Beery be, and they hereby are, removed as Directors of the Company, effective on this date."

That same day, Satell was replaced by Richard J. Maccarone [28] as President, and Beery was replaced by Joseph M. Mizelle as Chairman of the Board. February 23, 1973, Maccarone resigned as President and was replaced by Mizelle. Mizelle was obviously the principal officer of Foresight and was charged with the responsibility of liquidating that company.

At the time of the trial of this case in the district court, the liquidation of Foresight was still in process. The two New York banks had been largely paid. The $800,000 subordinated loan had not yet been paid. The student salesmen had been paid. Many of the creditors had been paid at the rate of 20 percent (at oral argument we were told that most of them had been). About $59,-000 worth of goods left on hand was given to various charities, and Mizelle testified that this action was taken only after attempts at sale had failed.

A consolidated balance sheet, dated October 30, 1972, and a balance sheet for East Coast, dated October 31, 1972, are in evidence as exhibits. The East Coast balance sheet shows a cash asset of $241,331. There is no evidence as to the origin of this item or its disposition. Since Fidelity was in charge of the liquidation of the two companies, and since all of the directors and officers of both companies (largely the same) are Fidelity officers or employees, it may only be presumed that this asset was taken by Fidelity.[29]

Shortly after November 1, 1972, Satell and Beery filed separate suits in a state court of Pennsylvania against Foresight, based upon the theory that Foresight had breached its contracts of employment with them. These suits were settled by Fidelity, and the obligations of Satell and Beery which were assigned to Fidelity as the dividend of April 3, 1972 were canceled as a part of the settlement. Also, Fidelity made other financial adjustments with Satell and Beery.[30]

## IV

The district court's decision rejecting appellant's claim against Fidelity seems to be based upon four holdings. (1) Fidelity did not guarantee Regal Ware's account with Foresight. (2) Fidelity in no way led Regal Ware to believe that it would be liable for Foresight's debts. (3) Although Fidelity controlled all the stock in both Foresight and East Coast, and at the end determined the policies of both corporations, those facts do not make it, a stockholder, liable for the debts of its subsidiaries. (4) If there were a preference (and the court expressly did not make any finding on that point), plaintiff was not legally harmed by it. The reason for this last point was that Regal Ware is a creditor of Foresight, but the preference, if any, was to creditors of East Coast, with assets of East Coast, against which Regal Ware had no claim.

---

**27.** This was done pursuant to the authority of Va.Code § 13.1–28 of the Virginia Stock Corporation Act.

**28.** Maccarone was already president of East Coast. That same day (November 1, 1972), Satell and Beery were removed as directors of East Coast.

**29.** See text at part VIII, infra, for our interpretation of the legal significance of this seizure.

**30.** See footnote 4 and text at footnote 17. Actually, six suits, three against Fidelity and two against Foresight by Satell and Beery, and one by Fidelity against Satell and Beery, were settled. The agreement also included "any other existing obligation." The agreement included the clause "any reference to Fidelity shall be deemed to include any of its subsidiaries."

**944**

Because we do not concur in the fourth basis of the decision of the district court, we express no opinion on the first three bases for its judgment and vacate the judgment dismissing Regal Ware's case against Fidelity.

■ The district court and Fidelity cite *Terry v. Yancey*, 344 F.2d 789 (4th Cir. 1965), *Mas v. NuGrape Co.*, 62 F.2d 113 (4th Cir. 1932), *Brown v. Margrande Compania Naviera*, 281 F.Supp. 1004, 1006 (E.D.Va. 1968), and *Beale v. Kappa Alpha Order*, 192 Va. 382, 64 S.E.2d 789 (1951), for the proposition that stock ownership does not make a corporate stockholder liable for the debts of the corporation whose stock it owns. This is the well known and generally accepted corporate fiction. We do not hold Fidelity liable for the debts of Foresight to Regal Ware because it controlled that company through its stock ownership and presently have no occasion to pierce the corporate veil between Fidelity and Foresight or Fidelity and East Coast. Our holding of liability is based upon our conclusion that Fidelity used its control of Foresight and East Coast to divert assets of Foresight which should have been used for creditors of that company, such as Regal Ware.

A more interesting problem is presented as to whether the corporate distinctiveness of Foresight and East Coast should be regarded or whether they should be considered as a single business enterprise. There are considerations both ways. They had almost identical directors. Also, their managements were the same until March of 1972. From that time on, Maccarone became the chief executive officer of East Coast while Satell and Beery continued to manage Foresight, although Fidelity directors came into control of that company. Those two companies usually prepared consolidated balance sheets. We need not decide this question, however, because we reach the same conclusion under either hypothesis.

V

■ If Foresight and East Coast be regarded as one enterprise, it is clear that Fidelity used its stock control to give preference to creditors whose debts it had guaranteed. The district court has held that Foresight was insolvent by September 1972, and thereafter, and we concur in that decision. Foresight and East Coast combined were also insolvent.

Fidelity argues that, absent bankruptcy, it is not legally objectionable for an insolvent debtor to prefer some creditors over others, relying on *Surratt v. Eskridge*, 131 Va. 325, 108 S.E. 677 (1921), and *Hutcheson v. Savings Bank of Richmond*, 129 Va. 281, 105 S.E. 677 (1921). From that proposition, it concludes that even if Foresight and East Coast be regarded as a single debtor, they could legitimately pay the debts to the New York banks even though, by doing so, the assets available to other creditors were lessened.

Neither of the cases control here. They do not involve the situation in which a parent corporation, which is also a creditor of an insolvent corporation, uses its stock control to give itself a preference as a creditor. That such cannot be done is clearly held in *Certain-teed Products Corporation v. Wallinger*, 89 F.2d 427 (4th Cir. 1937) (Virginia law), and *Darden v. Lee Company*, 204 Va. 108, 129 S.E.2d 897 (1963). In *Certain-teed*, this court stated on page 434:

> "Certain-teed invokes the rule that the mere fact that the voting stock of one corporation is owned by another, and that the two have the same officers and directors, does not make the holding company liable for the debts or engagements of the other or create the relation of principal and agent between them. On the other hand, the receiver cites authorities for the familiar statement that when such stock ownership and control are resorted to not for the purpose of participating in the affairs of the subsidiary corporation in a manner normal and usual with stockholders, but for the purpose of making it a mere agent or instrumentality or department of the holding company, the courts will look through the form of

the situation and deal with it as the justice of the case may require. . . ."

Again, on page 435, this court stated:

". . . It is no answer to say that in Virginia, a preferential transfer by an insolvent corporation to a stockholder has been held permissible in such cases as . . . [cases cited] for these cases do not go so far as to authorize a preference which has been obtained by a creditor in complete control of the affairs of a corporate debtor. The rule generally prevailing under such circumstances is to the contrary. . . ."

*Darden* followed *Certain-teed* which it cited with approval. For the same principle, see also the following decisions: *Freeman v. Swink*, 261 F.2d 84 (4th Cir. 1958), and *Davis v. Woolf*, 147 F.2d 629 (4th Cir. 1945). Here, Fidelity directed the September 19th assignment of the accounts receivable to a creditor (Fidelity Bankers Life Insurance Company) and itself for, at least, the purpose of preferring other creditors whose claims it had guaranteed. Fidelity therefore depleted the assets of Foresight and East Coast in order to protect itself from liability on its guarantee to the two New York banks and in order to prefer the wholly owned subsidiary (Fidelity Bankers Life Insurance Company) to general unsecured creditors such as Regal Ware.

## VI

If the corporate veil be respected and Foresight and East Coast be regarded as separate corporations, still Fidelity used its corporate control to deplete the assets of Foresight which should have been left available for all creditors. This act of depletion occurred in three respects: (1) by the assignments of September 18th and 19th, (2) by taking possession of the $241,331 of cash in the possession of East Coast on October 31, 1972, and (3) by the gratuitous distribution of surplus property to charitable organizations. We will later discuss the April dividend.

## VII

On September 18, 1972, Foresight, under the control of Fidelity directors, caused all accounts receivable to be assigned to East Coast. The next day, on September 19th, East Coast, also under the control of Fidelity directors, caused those same accounts receivable to be assigned, as security, to Fidelity and to Fidelity Bankers Life Insurance Company. Regal Ware was a creditor of Foresight but not of East Coast. Therefore, only the assignment of September 18th depleted the assets to which Regal Ware was entitled.

Fidelity seems to run together two arguments regarding the September 18th assignment. First, it is argued that title to the receivables passed when they were delivered and that the formal assignment was merely a *nunc pro tunc* act to formally recognize a *fait accompli*. Fidelity cites *Coffman v. Liggett*, 107 Va. 418, 59 S.E. 392 (1907), *Lone Star Cement Corp. v. Swartout*, 93 F.2d 767 (4th Cir. 1938), and *Stevan v. Union Trust Company of the District of Columbia*, 115 U.S.App.D.C. 36, 316 F.2d 687 (1963), for the proposition that an oral assignment, with delivery of the paper, was sufficient to accomplish an assignment of the receivables. Since the assignment covered East Coast file numbers 20 to 23599, from June 1, 1969 to September 14, 1972, it is probable that many of the receivables covered by the September 18th assignment had already been delivered to East Coast the argument goes.

Second, Fidelity also contends that actual cash consideration was paid by East Coast to Foresight for all of the receivables transferred. This is the crucial problem, because, even if the transfers were formally valid without the September 18th document, the resources of Foresight were depleted unless consideration was paid for all of the assignments. Fidelity oriented witnesses testified that consideration was paid. Satell, however, testified to the contrary. He acknowledged that upstreaming had occurred and contended that some of the accounts assigned on September 18th were

to offset money formerly received from East Coast by Foresight for which no accounts had been transferred. The district court apparently accepted that view, and we concur.[31] When the upstreaming occurred, Foresight became indebted to East Coast. When, on September 18, 1972, Foresight, at the direction of Fidelity, assigned accounts receivable to East Coast without receiving any new consideration, Foresight granted a preference to that creditor and thus depleted the assets available for other creditors.

■ There is another, and independent, reason why Fidelity depleted the assets of Foresight otherwise available for creditors. Reference is made to the September 19th assignment by East Coast to Fidelity and Fidelity Bankers Life Insurance Company. Fidelity was not a creditor of East Coast but a stockholder of a stockholder (Drum International) of a stockholder (Foresight) of East Coast. Payment to Fidelity, therefore, cannot be supported on the theory of payment of a debt. It is true that Fidelity Bankers Life Insurance Company was a creditor of East Coast. But the evidence was that the receivables assigned on September 19th were not used to reduce East Coast's $800,000 debt to that company. Nor could they have been so used because that debt had been subordinated to the debts to the two New York banks. Fidelity took the receivables assigned on November 19th and used them to eventually pay the two New York banks. Even if East Coast could have directly paid the two New York banks, it could not pay a stockholder three times removed. Unless East Coast did use the receivables to pay its creditor, it should have turned the assets over to its immediate stockholder, Foresight, to be used for the benefit of its creditors, such as Regal Ware.

It may be argued that this last line of reasoning is formalistic and that East Coast was merely doing indirectly what it could have done directly. In that connection, it must be remembered that this line of reasoning is predicated upon an alternative to piercing the corporate veil. The corporate fiction, itself, especially as applied between Foresight and East Coast, is dryly technical in nature and of questionable application at the best. Since Fidelity seeks separate treatment of the corporations for the purpose of preserving the corporation fiction, it is not unjust to require it so to do in the distribution of assets, and this is more true when such distribution admittedly preferred itself to the detriment of creditors.

## VIII

■ The balance sheet of East Coast, dated October 31, 1972, shows a cash asset of $241,331. The only reasonable inference to be drawn from the evidence is that this asset was seized by Fidelity.[32] But, as explained, Fidelity was not a creditor of East Coast. There is no evidence that this item was used for the benefit of any of East Coast's creditors. This cash item should have been forwarded to the sole stockholder of East Coast, Foresight, for the benefit of its creditors.

## IX

On April 3, 1972, the Fidelity dominated board of directors of Foresight declared a dividend of $53,942, which consisted of the obligations of Satell and Beery to Foresight.[33]

It is claimed that the action violated § 13.1–43 of the Code of Virginia [34] because

31. See footnote 25, supra. Guilford, Executive Vice-President of Fidelity, testified that the Foresight accounts were assigned ". . . to protect the creditors of East Coast, which included ours, unquestionably."

32. See text at footnote 29, supra.

33. See part II of the opinion.

34. § 13.1–43 provides in pertinent part:

"*Dividends.*—The board of directors of a corporation may, from time to time, declare and the corporation may pay dividends on its shares in cash, property or its own shares, *except when the corporation is. insolvent or when the payment thereof would render the corporation insolvent* or when the declaration or payment thereof would be contrary to any restrictions contained in the articles of incorporation, subject to the following provisions:

it is alleged the corporation was insolvent at the time, and there was neither earned nor capital surplus.[35] Fidelity now argues that the $53,942 dividend was not in fact a dividend but merely a taking of Foresight's property.

Whether the matter be considered a dividend, or whether it be considered a taking, to determine whether or not it may be set aside by Regal Ware requires findings of fact which were either not made or which we think we should not make upon the state of this record.

The district court did not address the issue of whether or not Fidelity was insolvent on April 3rd. While it seems unlikely that it would or should find that the good will of the company would have any more value on April 3rd than it had in September, when good will was found to be practically valueless, it must be remembered that Foresight in fact operated until the fall and indeed ran up its Regal Ware account sued upon during the intervening period. It is necessary to ascertain the question of the solvency of Foresight on April 3rd in order to determine whether § 13.1–43 of the Virginia Code was violated by a payment of a dividend while insolvent.[36]

If, as Fidelity now argues, the transfer of the Satell and Beery account to Fidelity was merely a taking of the property, the question of insolvency is also of consequence in considering whether or not the conveyance might be set aside under Virginia Code of 1950 §§ 55–80 or 55–81, and the cases construing those sections, or under general law.

It is also apparent that since the debt of Regal Ware arose after the April 3rd dividend, it probably could not set aside the taking as a voluntary conveyance under § 55–81, although it might as a fraudulent conveyance under § 55–80. *Consolidated Tramway Co. v. Germania Bank*, 121 Va. 331, 93 S.E. 572 (1917). Furthermore, the parties have not addressed themselves to the issue, and we do not, as to whether or not a creditor not existing at the time of the dividend, if it be considered a dividend, has standing to seek to have the same set aside as a matter of Virginia law. We also do not address the question as to whether or not the April 3rd transfer was from surplus, either capital or earned.

Because factual findings should be made upon which to base a decision as to whether or not the transfer of the Satell and Beery accounts to Fidelity should be set aside, as well as further conclusions of law, we remand this entire question to the district court for further fact finding and action not inconsistent with this opinion if necessary.

## X

In the final liquidation, around $59,-000 worth of unsold goods belonging to Foresight were distributed by Fidelity to charitable organizations. Joseph M. Mizelle, Fidelity's officer in charge of the liquidation process, testified that these gifts were made only after attempts to sell these goods had proven unsuccessful. However, there is no showing that efforts at disposition were sufficient to indicate a complete lack of market value. Fidelity did not disclaim the possibility of itself using these charitable contributions as income tax de-

(a) Dividends in cash or property may be declared and paid, except as otherwise provided in this section, only out of the unreserved and unrestricted earned surplus of the corporation or out of capital surplus, howsoever arising, but each dividend paid out of the capital surplus shall be identified as a distribution of capital surplus and the amount per share paid from such surplus shall be disclosed to the

stockholders receiving the same concurrently with the distribution."
. . . (Emphasis supplied).

**35.** The statute does indicate that dividends may be paid out of capital surplus if the stockholders are notified.

**36.** No question is raised that the payment made

ductions.[37] We hold that Fidelity is not liable to the creditors of Foresight for the book value of the goods given to charity, but only for the market value thereof at the time the gifts were made.

### XI

We hold that Regal Ware is entitled to a judgment against Fidelity in the amount of $210,571.96 with interest as provided in the judgment of the district court against Foresight, but with the condition that the judgment may not be satisfied other than from the ascertained value of the assets of Foresight wrongfully diverted by Fidelity, that is to say, the accounts assigned, and cash asset of $241,331, and the property given to charity. We think the value of such assets is far in excess of the amount of the judgment and that no further proceedings on this account will be required in the district court. But, if Fidelity denies that the total value of such assets exceeds the amount of the judgment, then the district court should ascertain the fair market value of the accounts receivable assigned at the time of their assignment, and the fair market value of the property given to charity at the time of the gift. Of course, the value of the $241,331 cash asset seized by Fidelity from East Coast is fixed. If the total fair market value of these items does not exceed the amount of the judgment, then the court should consider whether the April 3rd dividend, or taking, however it may be called, should be set aside. The amount of that dividend, of course, is fixed. If the first three items equal or exceed the judgment, then the district court need take no action with respect to the April 3rd dividend, but simply enter judgment against Fidelity in like amount and form as it did against Foresight. If the first three items do not equal or exceed the judgment, then the court should ascertain if the April 3rd dividend should be set aside, and, if so, it, in addition to the other three items, equals or

exceeds the judgment, the court should similarly enter judgment against Fidelity. If the total of all four items does not equal or exceed the judgment, then the district court should reduce the judgment to the value of the assets wrongfully diverted by Fidelity and enter judgment against Fidelity in that amount with interest from the same date the judgment against Foresight bears interest.

■ Late in the case, Regal Ware attempted to amend its complaint into a creditor's bill, which was refused by the district court. We hold that the district court did not abuse its discretion in refusing to allow Regal Ware to so amend the complaint at that late date.

■ We note, however, that Regal Ware and Fidelity do acknowledge the existence of other unsatisfied creditors of Foresight and also the existence of a creditors' suit pending in the Virginia courts. A copy of the complaint in the State court has been filed with us, along with a motion that we enjoin the prosecution of the creditors' action by Regal Ware in the Virginia court pending the outcome of the case here. The issues in our case are among those properly before the State court. In addition, the State court may find the decision here to be *res judicata* or that the parties are within allied estoppel doctrines. Regal Ware, by its motion to convert this case into a creditors' suit, and by bringing the creditors' suit in the State court along with another creditor, has sufficiently indicated its willingness that any recovery here be subject to the outcome of a proper creditors' suit. Accordingly, on remand, the district court will direct that the satisfaction of the judgment in this case be paid not to Regal Ware, but into the district court which will make the monies available to the Virginia court in which the creditors' suit is pending should that court indicate a willingness to dispose

---

Foresight insolvent, and we express no opinion on that matter.

**37.** When questioned on the subject, Fidelity officials testified that, because of loss resulting from other litigation, wholly unconnected with

this case, Fidelity would probably have no taxable income, and thus the question of use of these charitable donations as deductions may be moot.

of the proceeds of the judgment here in that case. If the State court declines to so dispose of the proceeds of the judgment in this case, then the district court will dispose of the said sum to those creditors of Foresight who may lawfully be entitled thereto had this suit been conducted as a creditors' suit. It follows that no injunction pending this appeal will issue for the reasons apparent from our discussion above, as well as because there are other creditors in the State court who are not parties to this case and over whom we have no jurisdiction to prevent their proceeding in the State court even were we so disposed.

### XII

We have considered the other contentions of Fidelity and are of opinion they are without merit.

We do not address the question of whether Fidelity should receive credit for liquidation expenses of Foresight because, as against Regal Ware, we do not think it should.

*VACATED AND REMANDED WITH DIRECTIONS.*