# Richmond

C. W. Beale v. Kappa Alpha Order and Kappa Alpha Alumni Foundation.

May 7, 1951.

Record No. 3735.

Present, Hudgins, C. J., and Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Christian, Barton, Parker & Boyd,* for the plaintiff in error.

*Christopher B. Garnett* and *Orrie P. Stevens,* for the defendants in error.

HUDGINS, C. J., delivered the opinion of the court.

This is an action instituted by Cyrus W. Beale, plaintiff, to compel the Kappa Alpha Order to pay an obligation (now, with interest, totaling more than $100,000) contracted by the Kappa Alpha Holding Corporation. The theory upon which plaintiff

bases his demand is that the Kappa Alpha Holding Corporation, hereinafter referred to as "Holding Corporation," and the Kappa Alpha Alumni Foundation, hereinafter referred to as "Foundation," were so organized and controlled and their affairs so conducted as to make each a mere instrumentality, agent or *alter ego* of the Kappa Alpha Order, hereinafter referred to as the "Order."

The Foundation made no appearance or defense to the action. The demurrer of the Order to the original declaration was sustained. Thereupon, plaintiff, by leave of court, filed an amended declaration to which the Order demurred. Defendant moved to strike certain allegations and to make others more specific. On consideration of these pleadings, the trial court stated "that the allegations of fact in the amended declaration are so interwoven with allegations constituting conclusions of law that it is difficult to segregate them and that if the attempt to segregate them were made and accomplished it would so destroy the context that it would leave the declaration almost unintelligible." The court thereupon ordered that the substance of the by-laws of the two corporations and reports of various committees and resolutions mentioned in the amended declaration be made a part thereof, or that such documents be filed as exhibits with the declaration.

Plaintiff elected to file the documents enumerated as exhibits, thus making the charters and by-laws of the three corporations, the reports, resolutions, minutes and publications of the Kappa Alpha Order and the Foundation (covering the period 1921-1933), constituting several thousand pages, a part of his amended declaration.

On consideration of the pleadings and the confusing mass of exhibits, the court held that the factual allegations of the amended declaration, when considered with the numerous exhibits, did not sustain the conclusions of law stated in the declaration, and entered an order dismissing the case from the docket. Plaintiff by this writ of error is seeking to reverse that judgment.

Plaintiff contends that his allegations in the amended declaration, which the demurrer admits to be true, are sufficient to present a jury question. Therefore, the trial court committed error in dismissing the case from the docket.

We shall make no attempt to segregate the factual allegations, plaintiff's interpretation of the documents, and his con-

clusions of law stated in the amended declaration. We shall confine our discussion to the pertinent facts gathered from the declaration and the documents.

In 1907 the Order, a Greek letter fraternity, founded in 1865, was incorporated under the laws of Virginia as a non-stock corporation. It is stated in the charter that the purpose of the corporation is "to maintain and establish active Chapters at educational institutions in Virginia, and elsewhere, and in towns and cities Alumni Chapters; to buy, erect, or receive by gift, devise, contract, conveyance or otherwise, property real or personal, at Lexington, Virginia, or elsewhere, within or without the State of Virginia, with grounds and appurtenances to be used as places for meeting, or depositories for archives, records and papers, of the Kappa Alpha Order, or any Chapter or officer thereof, and for such other purposes as the hereinafter named Trustees or their Successors may deem proper under suitable rules and regulations to be made by them under the authority of the Convention, constitution or by-laws of the Kappa Alpha Order, the said property and franchises are to be held and used solely for fraternal, benevolent, charitable and literary purposes, according to the principles, usages and teachings of Kappa Alpha Order."

All the powers of the corporation are vested in a Convention which meets biennially in odd-numbered years. The Convention is composed of delegates elected from the active Chapters, Alumni Chapters, and certain other persons. During the interim of Conventions the executive duties are vested in a board of five trustees elected biennially. The chief executive officer is called the "Knight Commander," who is *ex officio* chairman of the Board of Trustees.

Every person initiated remains a member of the Order for life, or until expelled for cause under rules and regulations prescribed.

The following resolution, offered by plaintiff and adopted at the 1921 Convention which met at Dallas, Texas, is the foundation of his contention that each of the two corporations thereafter created was the instrumentality, agent or *alter ego* of the Order:

"Whereas, The Kappa Alpha Order has never heretofore as such called upon its alumni members as a whole to contribute

materially to any fund towards furthering of interest of the said Order; and

"Whereas, the said Order has never established or attempted to establish a General Headquarters, or owned or occupied a building which was used as a General Headquarters building, and it is in our opinion that a building of suitable size and dignity, located in a proper locality within our chosen limits, in which building the Order may or might have or use as its General Headquarters Offices for the transaction of its business, or any part thereof, if it saw fit to so use said building; and, since this Convention is of the opinion that such a building located and properly equipped in a city located within our chosen limits, to be selected and determined by a committee composed of the General Officers and Province Commanders, (This selection shall be made before March first, 1922) would be of great sentimental and material benefit to the Order, and the alumni of the Order would welcome an opportunity to contribute towards the procuring of such a building and would and should be willing to so contribute; and

"Whereas, such buildings or headquarters are common among other well organized college fraternities, the same being furnished by the alumni of said fraternities, and have seemed to be of great benefit to the respective fraternities so owning or in possession of the same; and

"Whereas, it is the opinion of this Convention of having the Alumni contribute to building, equipment, etc., as above authorized, would be to appoint three Alumni members of the Order in good standing, no one of which shall be a General Officer, as a committee to formulate plans and to solicit funds and to do such other things as may be necessary or advisable to the end that such a building may be procured; and that said Committee should be financed to a greater or less degree by the Order;

"Now, therefore, Be It Resolved: That the K. C. shall appoint forthwith three alumni members of the Order in good standing, not one of whom shall be a general officer, which committee is and shall be authorized, empowered and directed by this, the Thirty-first Convention of the Kappa Alpha Order to take all steps necessary or desirable to raise or to solicit funds from any and all alumni of the Order, and others, for the purpose of acquiring or otherwise securing a suitable building, by purchase, lease or otherwise, in a city located within our chosen

limits, to be selected and determined by a committee composed of the General Officers and Province Commanders, such selection to be made before March 1st, 1922, the said building to be held and operated by a corporation governed and controlled as the said committee may provide, all to the end that the Order may have a suitable building in which all or a part of its business may be centered and transacted.

"And Be It Further Resolved, That to the end that the said Committee may more properly function and the solicitation of the alumni may be more successful, this Convention does hereby appropriate the sum of $2,500.00 to be paid to the Committee as follows:

"$1,000.00 on or before July 1, 1922.

"$1,500.00 after July 1, 1922, upon requisition from the Committee; provided, however, that the payment of the said $1,500.00 shall be paid only if the General Officers of the Order shall, after considering the progress of the committee, deem it wise and to the best interest of the Order that the same be paid.

"Resolved, Further, That the Committee when once named, shall have power to increase its number as it may see fit, and to fill any vacancies caused by any increase thus made, and shall also have power to fill any vacancies which shall be caused by resignations or refusal to serve or otherwise."

Pursuant to this resolution the Knight Commander appointed Cyrus W. Beale Chairman of the General Headquarters Committee and Douglas D. Ellington and Joseph Addison Hagan the other members. After Richmond, Virginia had been selected as the site for the proposed building by a committee composed of the General Officers and Province Commanders for that purpose, the General Headquarters Committee formulated plans for launching a campaign to obtain funds from the Alumni.

On March 29, 1923, plaintiff, J. Addison Hagan and Beverley B. Munford caused the Holding Corporation to be incorporated as a stock corporation, with a capital of not less than $300, nor more than $50,000, divided into shares of stock of the par value of $100 each. The purpose of the corporation stated in the charter was to buy, sell, rent, exchange, encumber and dispose of real and personal property, to buy and sell the assets and stocks of other corporations, and generally to have other powers of ordinary business corporations organized under the laws of Virginia. This corporation was controlled and managed by a

board of directors elected by the stockholders. The officers and directors named in the charter to manage the corporation for the first year were Hagan, Munford and Beale. Twenty persons bought five shares each and paid $10,000 into the treasury.

On May 28, 1923, the Holding Corporation purchased from the Davis Land Company a vacant lot facing Lee Circle on Monument and Allen Avenues, in Richmond, Virginia, and agreed to pay therefor $40,000, $10,000 of which was paid cash, and the balance evidenced by three notes of $10,000 each, payable in 1, 2 and 3 years from date, secured by deed of trust on the property.

The unpaid balance due on the notes, plus interest, is the obligation asserted in this action against the Order. It is alleged that plaintiff purchased the notes as they matured because he feared foreclosure proceedings would frustrate the plans of the Foundation and the Order, which were well known to him. Beale did not obtain the consent or the advice of the Order before making the purchases; indeed, he did not inform his associates of his action in the matter until May 2, 1928, approximately four years after he acquired the first note.

Plaintiff, Sam B. Witt, Jr. and J. Addison Hagan, the first two of whom were members of the General Headquarters Committee, and officers of the Holding Corporation, formed and caused to be incorporated the Foundation (Kappa Alpha Alumni Foundation). Plaintiff, Hagan and Walter S. Robertson were named in the charter as officers and trustees to manage the affairs of the corporation for the first year. The sole voting power and management of the affairs of the corporation were lodged in the Board of Trustees, consisting of not less than three nor more than twenty, with power to fill vacancies and elect additional trustees. It was a self-perpetuating body.

The purposes set forth in the charter of this corporation were quite different from those set forth in the charter of the Order. Sixteen specific objects were stated. Among them were the following:

(1) To aid any and all Kappa Alphas or such other persons as the trustees might select to receive instruction "in the various branches of a thorough and liberal education, literary, scientific and ornamental; and to be an institution of learning."

(2) To select members or other persons to be aided in carrying out research work in different branches of learning.

(3) To practice charity.

(4) To aid in maintaining manners, customs and ideals of character.

(5) To solicit donations for the purposes stated in the charter.

(6) To "erect, occupy, maintain and operate with the funds of the corporation a building in the city of Richmond, Virginia, to be known as the Kappa Alpha Alumni Foundation Building, which said building may be used, with the consent of the trustees, as the General Headquarters of the Kappa Alpha Order.·

(7) "Confer certificates, degrees, diplomas and other evidences of distinction and honor," and "offer and give rewards to any of its members and others for special achievements in educational pursuits and activities."

(8) "And, in general, to do all and everything necessary, incidental or proper for the accomplishment of any of the purposes or the attainment of any of the objects or the exercise of any of the rights and powers, hereinbefore enumerated, either alone or in association with any other corporation, firm or individual, as principals, agents, trustees, or otherwise, and by or through trustees, agents or otherwise."

With the objects and purposes of the corporation thus stated, plaintiff secured a ruling from the United States Treasury Department that the Foundation was a charitable educational institution and that gifts to it could be deducted from the Federal income tax. No such deductions were allowed for gifts made to the Kappa Alpha Order.

The Foundation then began a systematic campaign to solicit funds in the name of the Foundation and for its benefit. This appears in numerous pamphlets, published by the Foundation as the "Alumni Foundation Bulletin." The subscription agreement form provides that the subscription should be "To aid the KAPPA ALPHA ALUMNI FOUNDATION, in accomplishing the purposes set forth in its certificate of incorporation, and to encourage it in directing its first and best efforts towards the creation, through the solicitation of gifts from members of the Kappa Alpha Order and others, of funds up to $500,000.00, to the end that said funds may be used, among other purposes, for the purchase of a lot at Lee Circle in the City of Richmond, Virginia, * * * and the erection thereon of a building to be known as the Kappa Alpha Alumni Foundation Building, and used for

the work of the Foundation, and, which may be used as the General Headquarters for the Kappa Alpha Order, if the Trustees of the Foundation approve thereof and decide that such use will insure the work of the Foundation being better carried out. * * *

"It is understood that all payments made by virtue hereof are to be deposited by the said Foundation in the Virginia Trust Company, of Richmond, Virginia, and are not to be withdrawn by the Foundation to be expended except for purposes set forth in its certificate of incorporation."

Plaintiff, as chairman of the General Headquarters Committee, reported to the Convention its actions in forming the two corporations, submitted forms of subscription agreements and receipts, and asked the Convention to cooperate with the Foundation in raising funds for the purposes stated in the subscription agreement. The Convention expressed its appreciation of the work of the Committee, the plans of organization, and referred its request for additional funds to defray expenses to a special committee of the Convention.

This committee, after conferring with plaintiff and others, made its report to the Convention, wherein plaintiff was commended for his efforts in behalf of the Foundation and the Kappa Alphas, and stated that "the most vital feature of the headquarters scheme is the feasibility of raising a half million dollars, * * * to put up a building. * * * this time is really premature to say whether or not this money can be raised. * * * If at the end of 1925, * * * they can make a showing that they have actually so many bona fide subscriptions, or other time payments, or cash in hand, then we should go forward. But if at that time Brother Beale and this committee cannot show the proper amounts in hand or payable, then the proposition, the committee feels, ought to fall through. * * * If the scheme is not successful, I believe the Fraternity can well afford to lose this amount of money in having tried one big thing. The committee feel that if the General Headquarters Committee cannot raise the sum of $35,000 by that time, that our plan or suggestion of the General Headquarters Committee will of course be automatically suppressed. At the same time, if they can raise the sum of $35,000 by that time, it will be easily expected that by the next convention they could have fifty or seventy-five thousand in hand; and then it would be up to the next convention

to advise ways and means for going forward with it." The Convention appropriated the sum of $2500 for the expenses of the Committee.

At the next Convention, December, 1925, the General Headquarters Committee was directed to limit its activities to raising funds "rather than formulate plans for the spending of the funds raised." An appropriation of $5,000 was made to defray the expenses of the Committee, $2500 payable January 15, 1926 and $2500 payable "not sooner" than October, 1926, but to this appropriation was attached the following limitation: "Provided, further, however, that the Trustees of the Kappa Alpha Alumni Foundation shall prior to the payment of any amount hereby appropriated shall pass and certify that the Foundation will not attempt to purchase or erect any building for its uses until the plans, including the estimate of the cost of same shall have been submitted to and approved by a Convention of the Kappa Alpha Order."

The plaintiff, in one of his reports to the Convention, said: "we are greatly enthused over the prospects of the firm establishment of the Kappa Alpha Alumni Foundation, and we earnestly hope that the thirty-third Biennial Convention will be far-sighted enough *to aid its alumni* in establishing an institution to last throughout time with ever increasing glory of the Kappa Alpha Order, its members and to that great soul, General Robert E. Lee. * * *" (Italics supplied)

At the Thirty-fourth Biennial Convention, which met in Atlanta, in December, 1927, Doctor J. A. C. Chandler, then a trustee and officer of the Foundation, in an address to the delegates, stated: "From a financial standpoint we (the Foundation) want the support of this Convention, but it is not absolutely essential. We want, first of all, above everything else, a resolution that endorses the principle of the Foundation. This is my conclusion, a resolution that endorses the principle of the Foundation with instructions that a campaign be conducted among the Alumni for that Foundation, and requesting the General Officers, the Province Commanders, and the active and alumni chapters to co-operate in this campaign. I don't expect to ask a single active member of a single one of these chapters to contribute. This is the Alumni's business."

Following this address Mr. Beale, as chairman of the Committee, again made his report asking for money to defray the

expenses of the Committee. In the resolution presented by him this is stated: "WHEREAS under the plans the said Foundation will be established and financed entirely by the Alumni members of the Kappa Alpha Order, with the exception of the appropriations to be made by the conventions of the Order, for the purpose of financing the General Headquarters Committee."

It was suggested at this Convention that the by-laws and charter of the Foundation be amended so as to provide that the Knight Commander be *ex officio* trustee of the Foundation, and if any increase was made in the number of trustees, one of the other General Officers be placed on the board for every three additional members. The by-laws of the Foundation were so amended, but the charter was not changed. However, the Knight Commander was elected on the Board and served as such.

Plaintiff stated in the same report that the Foundation had secured $56,000 in subscriptions, $17,000 had been paid in cash, and "as that money comes in, every check is deposited in the Virginia Trust Company under agreement, and every man, who puts in a dollar, gets a receipt signed by an officer of the Virginia Trust Company, showing that that money is there, and cannot be withdrawn *except for* the purpose of the Foundation." (Italics supplied)

The trustees of the Foundation met on October 23, 1926, when Cyrus W. Beale, J. Addison Hagan and Douglas D. Ellington were nominated and elected as "Founder Members of the Kappa Alpha Alumni Foundation."

On May 2, 1928, the trustees (J. A. C. Chandler, Beverley B. Munford, Cyrus W. Beale, and Henry J. Mikell) ratified the action of the officers of the Foundation in paying $13,507.32 for all of the outstanding shares of stock (115) of the Holding Corporation.

At the same meeting the trustees of the Foundation, after being informed that Beale had purchased from the Davis Land Company the notes of the Holding Corporation, by proper resolution, assumed all obligations incurred by the Holding Corporation, including the amount of taxes paid on the lot, and the balance of the unpaid purchase price evidenced by the three $10,000 notes, with 6% interest on the principal compounded annually.

On February 14, 1929, J. A. C. Chandler, President, and

Cyrus W. Beale, Secretary, executed a deed in the name of the Holding Corporation, conveying the lot to the Foundation, subject to the condition stated as to the payment of the secured and unsecured debts.

Plaintiff reported to the Thirty-fifth Convention, December, 1929, that the lot purchased by the Holding Corporation had been deeded to the Foundation and that Beale owned the three $10,000 notes, payment of which was secured by lien on the lot. He stated to the Convention that the books of the Foundation showed a surplus of $23,847.84, and that among the assets listed was the lot facing Lee Circle valued at $65,000. He also stated that "under the plans the said Foundation will be established and financed entirely by the Alumni members of the Kappa Alpha Order, with the exception of the appropriations to be made by the conventions of the Order, for the purpose of financing the General Headquarters Committee." This committee was discharged with the understanding that the Foundation would continue the campaign to obtain donations and subscriptions for the erection of the Kappa Alpha Alumni Foundation Building.

Plaintiff requested the Order to authorize its General Officers and the Foundation to employ jointly a traveling secretary to be regarded as an employee of both corporations, each to pay its proportionate part of the expense to be incurred. This request was refused, but the Convention did appropriate $5,000 to be used by the Foundation to defray part of the expenses to be incurred by it in conducting the campaign to secure additional subscriptions for the Foundation.

At the Thirty-sixth Convention, which was held in December, 1931, plaintiff requested the Order to lend the Foundation a sum sufficient to pay the debt owing by it to him. This request was referred to a special committee of the Convention. On report of this committee the Convention adopted a resolution to the following effect:

(1) That plaintiff be reimbursed to the extent of $2,350.70 for expenses incurred by him for the Foundation.

(2) That the Order make no further donations or loans to the Foundation or any one associated with it until its future policy be definitely determined.

(3) That a committee be appointed to employ a disinterested

attorney to ascertain whether the Order was obligated to pay any obligation incurred by the Foundation.

During a discussion of these resolutions, Bishop Mikell, who was then Knight Commander and *ex officio* trustee of the Foundation, and who was fully informed of the activities of the Foundation and the Order, said: "As Knight Commander, part of this resolution seems to me most important, and that is that we shall employ legal counsel to tell the Order what its obligations are in the matter. I am, of course, as Brother Beale told you, a member of the Board of Trustees and have attended meetings, and never heard at the meetings Kappa Alpha as such was liable for the debt of the Foundation. I have never heard it until this convention that there was any question that as an Order we were liable. The question has now come up and it seems to be a question we must settle, and the only way to see it straightened out is that I would like to have this first part passed, so we can know for the first time our liabilities to the foundation.

"Are we liable for $52,000? If so, we are in pretty bad shape, but we must find out if we are."

Plaintiff, in discussing his request to the Convention to lend the money to the Foundation, said: "I have never heard the question come up about legal liability until this morning. I have no objection to legal counsel. The point, however, in this convention is as to whether this project shall be handled in such a way as to conform with the wishes of this convention.

"The minority report provides for the Fraternity lending money to permit the committee to go ahead. I understood the purpose of this committee was to forestall any claim. The minority report is to lend enough money and take this six percent note so your General Officers can go ahead if they want to."

The special committee so authorized, employed disinterested counsel, on the advice of whom it made the following report and recommendation to the Thirty-seventh Convention:

"Upon reviewing the entire history of the matter, this Special Committee concludes as stated, that the Kappa Alpha Order has never assumed, by action of its Convention, or otherwise, any legal obligation for the debts of the Kappa Alpha Alumni Foundation, or any legal obligation to the subscribers to the funds collected or attempted to be collected by the K. A. A. F. This Special Committee further finds that the original I. C. pro-

gram of the proponents of the Foundation was entirely too ambitious and there is no reasonable prospect of the plan being worked out to a successful conclusion. This Committee therefore makes the following

## RECOMMENDATION

"That the Kappa Alpha Order abandon all efforts to acquire a building for use as General Headquarters and that the Order should, in the future, decline to have any connection with the Kappa Alpha Alumni Foundation."

This report and recommendation were adopted by the Convention in December, 1933, and plaintiff instituted this action in May, 1934.

It is apparent from the foregoing statement of facts that all parties concerned knew that the Foundation and the Order, as separate entities, were cooperating for the purpose of acquiring an imposing building, sometimes referred to as "General Headquarters Building," and designated in the charter of the Foundation as "Kappa Alpha Alumni Foundation Building," for the use of both corporations.

■ The fundamental concept of a corporation is that it is a separate entity created under the law to enable a group of persons to limit their liability in a joint venture to the extent of their contributions to the capital stock. The property of the corporation is a basis for credit extended it and those dealing with it are limited in their recovery to the property owned and possessed by the corporation.

■ The Holding Corporation was an ordinary business corporation, with authority to issue and sell stock to the extent of $50,000. Only 115 shares were sold at par. $10,000 of the proceeds of the sale of this stock was paid to the Davis Land Company, Inc., as a part of the purchase price of the lot in question. The Davis Land Company extended credit to the Holding Corporation in the amount of $30,000. It knew, or was charged with knowledge of the fact that it was dealing with a corporation organized for business purposes and with a liability limited to the value of the property owned by it. There is nothing in the record to indicate that the Davis Land Company extended credit to any one other than the Holding Corporation. By this exten-

sion of credit it acquired no right against the Kappa Alpha Order, and hence could assign no such right to a third party.

Plaintiff contends that the Foundation controlled the Holding Corporation and that the Order controlled the Foundation. His allegations and exhibits do not sustain this position.

The stockholders of the Holding Corporation gave plaintiff or the Foundation options to buy the stock. These options were not exercised until after plaintiff had purchased the notes. During the interim, the officers elected by the stockholders continued to manage the affairs of the corporation.

The assignment of the notes to plaintiff gave him no right to hold the Order liable for the debts due by the Holding Corporation. Plaintiff, in acquiring the notes, acted on his own initiative and without the knowledge or consent of the Order. The mere fact that he knew that both the Foundation and the Order were cooperating to obtain funds to erect a General Headquarters Building, or Kappa Alpha Alumni Foundation Building, did not obligate the Order to pay the debts in question. When the stockholders of the Holding Corporation, or its assigns, decided to dissolve the corporation, plaintiff requested the Foundation, and not the Order, to assume the payment of the notes held by him.

Plaintiff contends that the statement in 1 Fletcher Cyclopedia Corporations, sec. 43, p. 154, should be applied:

"A very numerous and growing class of cases wherein the corporate entity is disregarded is that wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation."

This, or similar statements are found in several cases. However, usually something more is required to induce the court to disregard the entity of a corporation. The principle thus stated is condemned, and a more accurate statement is made, in *Gledhill* v. *Fisher & Co.*, 272 Mich. 353, 357, 358, 262 N. W. 371:

"Before the corporate entity may be properly disregarded and the parent corporation held liable for the acts of its subsidiary, I believe it must be shown not only that undue domination and control was exercised by the parent corporation over the subsidiary, but also that this control was exercised in such a manner as to defraud and wrong the complainant, and that unjust loss or injury will be suffered by the complainant

as the result of such domination unless the parent corporation be held liable. The rule is correctly stated by Ballantine in an article on the separate entity of corporations, in 60 American Law Review, page 19, as follows:

" 'But to justify treating the sole stockholder or holding company as responsible it is not enough that the subsidiary is so organized and controlled as to make it "merely an instrumentality, conduit or adjunct" of its stockholders. It must further appear that to recognize their separate entities would aid in the consummation of a wrong.' "

Plaintiff cites Sec. 6 of Powell on Parent and Subsidiary Corporations, where the author states the combination of certain facts and circumstances, which it is claimed requires the court to disregard the entity of corporations. The text, to a large extent, is confined to facts and circumstances relevant to stock corporations, which are not controlling in this case, as both the Order and the Foundation were non-stock corporations and were not organized for business purposes.

Powell states the general rule accurately in Sec. 3, p. 6, of his book thus: "A refusal to recognize the ordinary immunity of stockholders not only overturns a basic provision of statutory or common law, but is also contrary to a vital economic policy underlying the whole corporate concept. Such a result must therefore be viewed as an extraordinary exception and should be permitted only in cases in which it is necessary in order to promote justice. Relief against the parent corporation, therefore, should be granted only if a refusal to do so would result in an unjust loss or injury to the complainant."

▇ The facts upon which plaintiff relies are not sufficient to require the court to disregard the separate entity of the Order and the Foundation.

It appears from the record (1) that the Order elected not to undertake to finance a General Headquarters Building, as it had a right to do under its charter, but elected to appoint a committee, with authority to form a corporation for this purpose; (2) the committee, acting under this authority, caused the Foundation to be incorporated for the purposes heretofore stated, and the Order approved this action of the committee; (3) the two corporations were managed and controlled by separate boards of trustees; trustees of the Order were elected every two years by the Convention, the trustees of the Founda-

tion were a self-perpetuating body, and all vacancies on the Board were filled by the trustees themselves; (4) the minutes of the separate meetings of the governing authority of the Order were kept by its secretary and the minutes of the meetings of the trustees of the Foundation were kept by its secretary; (5) the Order received its income from fees and dues and the Foundation received its capital and income from voluntary contributions made by the Alumni; (6) it was understood that the purchase of the lot and the erection of a building were ventures to be undertaken by the Alumni and not by the Order.

The Foundation sought and obtained the active cooperation of the Order in its endeavor to obtain funds from the Alumni, but all contributions were made to the Foundation, deposited in bank to the credit of the Foundation, and could be withdrawn only by the Foundation. The minutes of the different Conventions reveal that neither the Order nor the Foundation contemplated that the Order would finance the Foundation or be liable for any debts incurred by it. This was stated, in effect, by Dr. J. A. C. Chandler, who was at one time Knight Commander and President of the Foundation; by Bishop Mikell, who was Knight Commander and trustee of the Foundation, and by plaintiff himself.

The attempt to hold the Order liable for the obligations asserted appears to be an afterthought. The question of the liability of the Order for the debts of the Foundation did not arise until December, 1931, when members of the Convention were requested to *lend* the Foundation sufficient funds to pay its obligations to plaintiff. The Convention, before deciding the question, referred it to a special committee, with the result heretofore stated.

No one was in a better position than plaintiff to know the relations between the Foundation and the Order. He was a director and officer of the Holding Corporation, trustee and officer of the Foundation, and a delegate to the Conventions. It is stated in one of his reports to the Convention that the Foundation was a solvent corporation with a surplus of more than $20,000. The inference is that when he voluntarily paid, or acquired, the notes of the Holding Corporation, he relied upon the financial ability of the Foundation to pay the obligation, as he requested it and not the Order to assume the debt.

"* * * Just when a corporation will be regarded as the adjunct, creature, instrumentality, device, stooge, or dummy of another corporation is usually held to be a question of fact in each case. As above stated the general rule is that the separate corporate entity of corporations will be observed by the courts, even though one may dominate or control another, or may treat it as a mere department, instrumentality, agency, etc.; and courts will disregard the separate legal identities of the corporation only when one is used to defeat public convenience, justify wrongs, protect fraud or crime of the other." *State* v. *Swift & Co.* (Tex. Civ. App.), 187 S. W. (2d) 127, 133.

The Order has perpetrated no fraud, nor has it been guilty of any concealment or misrepresentations which make it liable for the debts of the Foundation.

The judgment of the trial court is

*Affirmed.*