**PERPETUAL REAL ESTATE SERVICES, INCORPORATED,**
Plaintiff–Appellee,

v.

**MICHAELSON PROPERTIES, INCORPORATED; Aaron I. Michaelson,**
Defendants–Appellants.

**PERPETUAL REAL ESTATE SERVICES, INCORPORATED,**
Plaintiff–Appellant,

v.

**MICHAELSON PROPERTIES, INCORPORATED; Aaron I. Michaelson,**
Defendants–Appellees.

Nos. 92–1004, 92–1014.

United States Court of Appeals,
Fourth Circuit.

Argued July 7, 1992.

Decided Sept. 8, 1992.

Paul Martin Wolff, Williams & Connolly, Washington, D.C., argued (J. Alan Galbraith and William M. Wiltshire, on brief), for defendants-appellants.

William Dennis Cross, Morrison & Hecker, Kansas City, Mo., argued (William E. Hanna, Morrison & Hecker, Kansas City, Mo., Michael E. Tucci, Morrison & Hecker, Washington, D.C., David L. Lingerfelt, Robert J. Lowe, Jr., Lowe & Lingerfelt, Alexandria, Va., Michael A. Schlanger, Philip J. Harvey, Christine M. Nicolaides, Kent J. Morton, Shaw, Pittman, Potts & Trowbridge, Washington, D.C.), for plaintiff-appellee.

Before WILKINSON, NIEMEYER, and LUTTIG, Circuit Judges.

OPINION

WILKINSON, Circuit Judge:

In this case plaintiff has sought to pierce the corporate veil of its former business partner, Michaelson Properties, Inc. (MPI), and to hold MPI's sole shareholder, Aaron Michaelson, personally responsible for MPI's contractual liability. The jury returned a verdict in plaintiff's favor, and the district court upheld the jury's decision to pierce MPI's corporate veil. We reverse. The jury instructions in this case misstated the applicable standard under Virginia law, and the jury verdict improperly stripped Michaelson of the limited liability to which his business partner had agreed in the course of their negotiations. Virginia law will not permit the corporate veil to be pierced in this case, and we remand for entry of judgment in Michaelson's favor.

I.

In August 1981, defendant Aaron Michaelson formed Michaelson Properties, Inc., for the purpose of entering into joint real estate ventures. MPI was incorporated under the laws of the state of Illinois with initial paid-in capital of $1,000. Michaelson was the president and sole shareholder.

MPI subsequently entered into two joint ventures with Perpetual Real Estate Services, Inc. (PRES), the plaintiff in this case, involving the conversion of apartment buildings into condominiums. The first was formed in October 1981, and was known as Bethesda Apartment Associates (BAA). Under the BAA partnership agreement, each partner was to contribute $100,000 to a working capital fund, and MPI was to put up a $1 million letter of credit. Michaelson and his wife, Barbara, agreed to personally indemnify PRES against any loss on MPI's letter of credit. The BAA partnership sold the last condominium unit in 1983, and distributed about $600,000 in profits to each partner in 1985.

The second partnership, known as Arlington Apartment Associates (AAA), was formed in November 1983. Under the AAA partnership agreement, both PRES

and MPI contributed $50,000 in capital, and each agreed to share *pro rata* in satisfying any liabilities of the partnership. The partnership also borrowed $24 million from Perpetual Savings Bank, PRES's parent corporation, but only after Aaron and Barbara Michaelson agreed to personally guarantee repayment of $750,000 of the loan. When an additional $2.1 million was needed to complete the project, MPI could not come up with the money so PRES loaned MPI $1.05 million, again after PRES secured a personal guarantee of repayment from the Michaelsons.

During 1985 and 1986, the AAA partnership made various distributions of the profits from the condominium units. Prior to each distribution, the partners made the determination, as required by the partnership agreement, that they were leaving sufficient assets to permit the partnership to meet its anticipated expenses. Three distributions were made to PRES and MPI, totalling approximately $456,000 to each partner. MPI then authorized distributions of its profits to its sole shareholder, Aaron Michaelson.

In 1987, more than a year after the last of these distributions, several condominium purchasers filed suit against AAA, asserting breach of warranty claims in the amount of $5.5 million. Shortly before the case went to trial, counsel for AAA entered into settlement negotiations. The case was ultimately settled for $950,000. PRES paid the full amount on behalf of the partnership; MPI made no contribution toward the settlement since its profits had been distributed years earlier.

PRES then filed this diversity action against Michaelson and MPI. The complaint sought indemnity from MPI pursuant to the AAA partnership agreement and asserted that Michaelson had received unlawful distributions from MPI. PRES also asserted two theories for holding Michaelson personally responsible for MPI's debt: (1) that Michaelson had made an oral promise during settlement negotiations to an-

swer for MPI's debt; and (2) that MPI was Michaelson's "alter ego or mere instrumentality" and that MPI's corporate veil should be pierced. Both parties—and the district court—agreed that Virginia law controls.

The district court entered summary judgment on the contractual indemnity claim against MPI. The remaining counts proceeded to trial. At the close of the evidence, Michaelson moved for a directed verdict. On the unlawful distribution count, Michaelson argued that the applicable statute of limitations had expired. The district court agreed, and entered judgment in Michaelson's favor.[1] On the "veil piercing" count, Michaelson argued that PRES had failed to justify disregarding the corporate form under Virginia law—that PRES had failed as a matter of law to prove that Michaelson had used MPI as a "device or sham" to "disguise wrongs, obscure fraud, or conceal crime," as required by *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 360 S.E.2d 828, 831 (1987). The court denied this motion, and submitted both the veil piercing and oral promise counts to the jury.

The jury subsequently returned a verdict in favor of PRES on the veil piercing count, but decided in Michaelson's favor on the oral promise count. Michaelson filed a motion for jnov, which was rejected by the district court. 775 F.Supp. 893 (E.D.Va. 1991). Michaelson appeals.

## II.

Michaelson makes two principal arguments on this appeal. He first argues that the district court's jury instruction on veil piercing misstated the standard applicable under Virginia law. Second, he argues that under the appropriate standard he is entitled to judgment as a matter of law. We will address these arguments in turn.

## A.

Virginia courts have long recognized the basic proposition that a corporation is a

---

1. PRES seeks to challenge the district court's holding that Virginia's two-year statute of limitations, Va.Code Ann. § 13.1–692(C), had extinguished its unlawful distribution claim. However, PRES offers no convincing argument for resuscitating its claim.

legal entity separate and distinct from its shareholders. *See Beale v. Kappa Alpha Order*, 192 Va. 382, 64 S.E.2d 789, 796 (1951); *Cheatle*, 360 S.E.2d at 831. A fundamental purpose of incorporation is to "enable a group of persons to limit their liability in a joint venture to the extent of their contributions to the capital stock." *Beale*, 64 S.E.2d at 796. This concept of limited liability "supports a vital economic policy," *Cheatle*, 360 S.E.2d at 831, a policy on which "large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944).

 Virginia courts have assiduously defended this "vital economic policy," lifting the veil of immunity only in "extraordinary" cases. *Beale*, 64 S.E.2d at 797; *Cheatle*, 360 S.E.2d at 831. Under Virginia law, plaintiff bears the burden of convincing the court to disregard the corporate form, and must first establish that "the corporate entity was the *alter ego*, alias, stooge, or dummy of the individuals sought to be charged personally." *Cheatle*, 360 S.E.2d at 831. This element may be established by evidence that the defendant exercised "undue domination and control" over the corporation, *Beale*, 64 S.E.2d at 797, and the jury instruction in this case fairly described this aspect of the test. Under this element of the test, the court properly permitted the jury to consider such factors as whether Michaelson "observe[d] corporate formalities," whether he kept "corporate records," whether he paid dividends, and whether there were "other officers and directors."

The Supreme Court of Virginia has specifically held, however, that proof that some person "may dominate or control" the corporation, or "may treat it as a mere department, instrumentality, agency, etc." is not enough to pierce the veil. *Beale*, 64 S.E.2d at 798. In Virginia, "something more is required to induce the court to disregard the entity of a corporation." *Id.* at 797. Hence, plaintiff must also establish "that the corporation was a device or sham used to disguise wrongs, obscure

fraud, or conceal crime." *Cheatle*, 360 S.E.2d at 831. *See also Garrett v. Ancarrow Marine, Inc.*, 211 Va. 755, 180 S.E.2d 668, 670 (1971); *Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 147 S.E.2d 747, 753 (1966); *Beale*, 64 S.E.2d at 797–98.

The stringency of the Virginia standard is illustrated by the facts of *Cheatle*. In that case plaintiff Rudd's Swimming Pool Supply Co. (Supply) brought suit against its successor corporation, Rudd's Swimming Pool Management & Service Co. (Management), to recover on two promissory notes from Management. Management's shareholders (including the Cheatles), however, reorganized into a new corporation (Regency Pool Corporation), deliberately rendering Management incapable of paying on its notes to Supply. 360 S.E.2d at 830–31. Supply obtained a default judgment against Management and convinced the trial court to impose personal liability against the Cheatles. On appeal, the Virginia Supreme Court emphasized that the reorganization from Management to Regency impacted solely upon *Management's* obligations to Supply, and did not "warrant the extraordinary action" of imposing individual liability for Management's "corporate debt upon the Cheatles." *Id.* at 831. Like Michaelson in the instant case, the Cheatles had "neither endorsed the promissory notes nor guaranteed the open account indebtedness." *Id.* Characterizing the evidence as "utterly insufficient to justify casting aside the corporate entity," the Virginia court reversed the trial court's decision to pierce Management's veil of immunity. *Id.*

 The jury instruction in this case simply failed to communicate the essence of Virginia law in this area. Virginia adheres to a rigorous standard requiring proof that the defendant used the corporation to "disguise" some legal "wrong." This strict standard contrasts starkly with the rather soggy state in which the law was submitted to the jury, which was permitted to impose personal liability on Michaelson if it found that Michaelson dominated MPI and used MPI to perpetrate "an injustice or fundamental unfairness." The fact that limited liability might yield results

that seem "unfair" to jurors unfamiliar with the function of the corporate form cannot provide a basis for piercing the veil. Virginia law requires proof of some legal wrong before it undermines this basic assumption of corporate existence.

It is true, as PRES points out, that the requirement of "injustice or fundamental fairness" follows the language of this court's opinion in *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir.1976). *DeWitt*, however, did not involve Virginia law, but applied a different standard that permits the corporate veil to be pierced "in appropriate circumstances even in the absence of fraud or wrongdoing." *Cunningham v. Rendezvous, Inc.*, 699 F.2d 676, 680 (4th Cir.1983). That is plainly not the law in Virginia, and the judgment cannot stand.[2]

### B.

Ordinarily, an erroneous jury instruction would require the case to be remanded for a new trial. Under the correct standard of Virginia law, however, we think for the reasons that follow that PRES is unable to raise a triable issue with respect to piercing the corporate veil in this case.

The district court pointed to several factors established by the evidence that purportedly justify such action. The district court noted that there was evidence from which a jury could find that Michaelson was the sole shareholder of MPI, that he was the sole director of MPI, that corporate formalities were not observed, that corporate capitalization was not adequate, and that corporate records did not indicate payment of any dividends. 775 F.Supp. at 897 n. 6.

Michaelson has offered his own version of the evidence on these issues, and has suggested that the court's findings were clearly erroneous.[3] We shall not reach this question, however, since the findings of the district court focus primarily on the first part of the test announced in *Cheatle*, and ignore the second half of that test. Even if we assume that MPI was Michaelson's "alter ego, alias, stooge, or dummy," *Cheatle*, 360 S.E.2d at 831, or that Michaelson exercised "undue domination and control" over MPI, *Beale*, 64 S.E.2d at 797, PRES's attempt to pierce the corporate veil must fail unless Michaelson used MPI to "disguise wrongs, obscure fraud, or conceal crime." *Cheatle*, 360 S.E.2d at 831. The district court found—and PRES appears to concede—that there was no evidence that Michaelson used the corporation to "obscure fraud" or "conceal crime." The only question, then, is whether a reasonable jury could have found that Michaelson somehow used MPI to "disguise wrongs."

■ PRES has simply failed to show that Michaelson used the corporate form to "disguise wrongs." PRES and MPI had entered into a longstanding contractual relationship, and PRES had full knowledge of the nature of its corporate partner, including its ownership structure and capitalization. PRES even participated in the decisions to distribute money to itself and to MPI after determining that the AAA partnership had sufficient assets to cover its anticipated expenses, and PRES apparently sought no limitations on what MPI did with those funds. PRES has sought on appeal to attack MPI's distributions to Michaelson by labelling them an unfair "siphoning" of

---

**2.** PRES's argument that Michaelson failed to preserve an objection to the jury instruction is misplaced. Michaelson specifically requested a *Cheatle* instruction and noted a "general exception to the instructions on the grounds that they don't comport with the *Cheatle* case."

**3.** Although we need not choose sides on these issues, we note that the district court's findings as to these matters were conclusory. The absence of corporate formalities, for example, was not explained. While we have noted that "small businesses often act informally," *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862

F.2d 1044, 1048 (4th Cir.1988), here, by and large, corporate formalities were observed. MPI maintained a separate corporate checking account, filed professionally prepared corporate tax returns, and kept a minute book of annual reports and records of major corporate transactions. MPI, in short, sought to maintain a separate existence, particularly in its dealings with PRES. Similarly, with respect to the absence of a dividend, MPI's distributions to its sole shareholder would plainly be tantamount to a dividend.

funds. It was entirely foreseeable to PRES, however, that MPI would distribute those funds to Michaelson, its sole shareholder. When MPI did distribute the funds, it did so well before any claims were filed against the partnership and in a manner that PRES has not shown would violate Virginia law.

PRES points out, however, that in a number of contexts PRES did negotiate personal guarantees from Michaelson, and insists that such guarantees weaken MPI's corporate veil. We think, to the contrary, that they fortify it. Courts have been extraordinarily reluctant to lift the veil in contract cases, such as this one, where the "creditor has willingly transacted business" with the corporation. *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 693 (5th Cir.1985). In other words,

> courts usually apply more stringent standards to piercing the corporate veil in a contract case than they do in tort cases. This is because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form, while this is not the situation in tort cases.

1 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.85 at 712 (1990 ed.). Thus, in contract cases, where "each party has a clear and equal obligation to weigh the potential benefits and risks of the agreement," *United Paperworkers Int'l Union v. Penntech Papers, Inc.,* 439 F.Supp. 610, 618 (D.Me. 1977), *aff'd* 583 F.2d 33 (1st Cir.1978), courts have emphatically discouraged plaintiffs seeking to disregard the corporate form. *See* Frank Easterbrook and Daniel Fischel, *The Economic Structure of Corporate Law* 58 (1991). In such cases, courts have required proof of some form of misrepresentation to the creditor:

> Unless the [corporation] misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the [corporation]; it should not be able to complain later that the [corporation] is unsound.

*Jon–T Chemicals,* 768 F.2d at 693. *See also Interocean Shipping Co. v. National Shipping & Trading Corp.,* 523 F.2d 527, 539 (2d Cir.1975) (requiring conduct "akin to fraud" in order to pierce the veil in contract cases); *Penntech Papers,* 439 F.Supp. at 618; Easterbrook & Fischel, *supra,* at 58. Here PRES and MPI were joint venturers in real estate, each familiar with the other. PRES has failed to point to anything that suggests that Michaelson misled PRES as to its financial condition— there is simply no indication that Michaelson used MPI to "disguise" anything. While PRES has asserted that Michaelson misled PRES by making an oral promise to contribute personally to the settlement of the lawsuit, Michaelson testified that no such promises were made, and the jury agreed with him. PRES has not appealed from this aspect of the judgment, and we will not interfere with it.[4]

■ Absent some evidence of misrepresentation, "courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established." Fletcher, *supra,* § 41.85 at 713. Parties to a commercial transaction must be free to negotiate questions of limited liability and to enforce their agreements by recourse to the law of contracts. PRES surely under-

---

**4.** PRES also suggests that this case is controlled by our decision in *Cancun,* 862 F.2d at 1048, which upheld the imposition of personal liability, under Virginia law, on the sole shareholder of a corporation under theories of fraud and breach of warranty. *Cancun* is distinguishable from the case at hand, however. Here the plaintiff and defendant entered into a series of transactions as business partners, and negotiated, after full and accurate disclosure, over issues of personal liability. In *Cancun,* by contrast, the plaintiff was an unsuspecting third party who "was injured by [the sole shareholder's] misrepresentations." 862 F.2d at 1048. Thus, because the sole shareholder "treated his corporate and personal affairs as if they were indistinguishable," even to the point of using corporate funds for personal pedicures, we concluded that the plaintiff was entitled to do the same. *Id.* In so holding, we noted that the "court's power to pierce the corporate veil and impose liability on a shareholder in his individual capacity is ... to be exercised with extreme circumspection." *Id.* at 1047.

stood that principle, and thus went to the trouble of securing Michaelson's personal guarantees on several matters. Michaelson and his wife signed documents agreeing to personally indemnify PRES against loss on MPI's letter of credit and to personally guarantee repayment on two loans to MPI. The amounts were very specific: the Michaelsons were to be personally liable for up to $1 million on the letter of credit, and for $750,000 and $1.05 million on the two loans. Significantly, the AAA joint venture agreement included no personal guaranties by Michaelson, and the jury, as noted, found that Michaelson had made no oral promises to answer for MPI's debt. As a matter of contract, then, Michaelson was entitled to insulation from personal liability on the claims from the AAA partners, and it is not our place to restructure the parties' agreement.

From the outset, MPI was a limited liability corporation formed for the express purpose of entering joint ventures in real estate. The parties in this case expressly put the issue of limited liability on the bargaining table, and settled on an agreement that required MPI—not Aaron Michaelson—to answer for the debts of the partnership. Exceptions to this rule were plainly spelled out by the parties in writing. The jury verdict stripped Michaelson of the protections against personal liability to which he was entitled under the settled corporate law of Virginia. It awarded to PRES a new contract—one that bestowed on PRES a personal guarantee on the part of Michaelson that PRES had been unable to obtain at the bargaining table—apparently on the ground that the actual agreement resulted in a "fundamental unfairness." Be that as it may, Virginia law plainly says that fairness is for the parties to the contract to evaluate, not the courts. Our task is rather one of enforcement.[5]

### III.

In conclusion, PRES is a disconsolate joint venturer who now wishes it had been doing business with an individual, and not a corporation. That was not the case, however, and, for the foregoing reasons, we reverse and remand with directions that the district court enter judgment for defendant Michaelson.

REVERSED.

---

**5.** Michaelson has also argued that the issue of piercing the corporate veil is equitable in nature and should therefore have been decided by the court rather than the jury. Because we conclude that Michaelson is entitled to judgment as a matter of law, we need not address this issue.