Present:   All the Justices

C.F. TRUST, INC., ET AL.

                      OPINION BY CHIEF JUSTICE LEROY R. HASSELL, SR.
                                  June 6, 2003
v.  Record No. 022212

FIRST FLIGHT LIMITED PARTNERSHIP

              UPON QUESTIONS OF LAW CERTIFIED BY THE
       UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

                                  I.

     Pursuant to Rule 5:42, the United States Court of Appeals

for the Fourth Circuit certified to this Court the following

questions of law, which we agreed to consider:

        "(1) Would Virginia recognize a claim for
     outsider reverse veil-piercing under the facts of
     this case?
        "(2) If the answer to (1) is yes, what
     standards must be met before Virginia would allow
     reverse veil-piercing of the limited partnership
     here?"

                                 II.

                                 A.

     C.F. Trust, Inc., a Florida corporation, and Atlantic

Funding Corporation, a Nevada corporation, filed an action in

the United States District Court for the Eastern District of

Virginia and sought a declaration that First Flight Limited

Partnership, a Virginia limited partnership, is the alter ego

of Barrie M. Peterson, who had endorsed and guaranteed certain

promissory notes.  C.F. Trust and Atlantic Funding obtained

judgments against Peterson for the principal and interest on the notes and sought to satisfy their judgments against Peterson with assets held by First Flight. The federal district court concluded that this Court would permit reverse veil piercing and that court entered a judgment requiring First Flight to use its assets to satisfy the judgments of C.F. Trust and Atlantic Funding.

B.

The United States Court of Appeals' certification order contained the following facts which are relevant to our disposition of this proceeding.

"C.F. Trust and Atlantic Funding each hold commercial promissory notes endorsed and guaranteed by Peterson. As the district court noted, this case constitutes just one chapter in a prolonged tale involving C.F. Trust's and Atlantic Funding's efforts to collect a combined total of more than $8 million on their notes, and Peterson's equally determined efforts to avoid paying anything to them.

"C.F. Trust . . . holds two notes, dated November 1, 1993, in the total principal amount of $6,064,903.57. Not only Barrie Peterson, individually and as trustee, but also his wife, Nancy Peterson, endorsed and guaranteed both notes. C.F. Trust formally notified the Petersons of their default on the notes on August 31, 1995. . . . On February 1, 1996, a

2

[circuit court in Virginia] entered judgment in favor of C.F. Trust and against the Petersons, jointly and severally, for the amount of the notes, plus interest. . . .  In September 1998, when the Petersons still had not paid on the judgment, C.F. Trust sought and obtained a charging order from the [circuit] court that charged the Peterson[s'] interests in various partnerships, including First Flight, with paying the judgment on the notes.  Then, on March 18, 1999, the [federal] district court issued garnishment orders against various Peterson corporations, including Birchwood Holdings Group, Inc., to C.F. Trust.

"Atlantic Funding . . . holds a single note, endorsed and guaranteed by Peterson, individually and as trustee, in the principal amount of $1,000,000.  Atlantic Funding purchased its note along with the right to enforce a corresponding and preexisting judgment, entered on November 15, 1991, against Peterson for the principal amount of that note, plus interest. On March 1, 1996, a Virginia [circuit] court granted Atlantic Funding a charging order charging Peterson's interest in First Flight with paying the judgment on the Atlantic Funding note, and, on March 15, 1996, issued a second charging order charging another Peterson entity with paying the same judgment.

"On November 18, 1999, having still received no payment on the judgments, C.F. Trust and Atlantic Funding initiated this diversity action against Peterson, Mrs. Peterson, and Peterson's son, Scott Peterson, as well as against various Peterson entities, including First Flight. . . .  C.F. Trust and Atlantic Funding alleged that Peterson still owed on the judgments and sought a declaration that each of the other defendants was Peterson's alter ego and, therefore, liable on the judgments.

. . . .

"A four-day bench trial began on August 28, 2000.  The evidence presented at trial showed that Peterson had engaged in two different practices in order to avoid paying C.F. Trust's and Atlantic Funding's judgments.

"First, Peterson directed transfers from various Peterson entities to Birchwood Holdings Group, Inc. (BHG), a corporation wholly owned by Peterson.  BHG provided managerial and administrative support to other Peterson entities for a fee, which was calculated according to a cost allocation method.  During the relevant period, however, Peterson directed transfers of approximately $1.9 million in overpayments to BHG – excess payments beyond those to which BHG was entitled based on the applicable cost allocation – and

4

then directed BHG to pay more than $2 million of Peterson's personal expenses.

"Through this method, Peterson maintained a lifestyle that, he estimated, cost 'between 10 and 15 thousand dollars a month.' The expenses paid by BHG included: mortgage and repair payments on a Peterson residence in Fairfax, Virginia; mortgage payments on a Peterson residence in Nantucket, Massachusetts; Peterson's country club membership fees; car payments for Peterson's Mercedes [Benz]; the Petersons' credit card bills; Peterson's ATM fees; college tuition for Peterson's younger son, Christopher Peterson; and payments to Mrs. Peterson. BHG even paid the substantial legal fees incurred by Peterson and Mrs. Peterson, as well as by various Peterson entities, to defend the suits brought by C.F. Trust and Atlantic Funding to collect on their notes.

"Yet, Peterson contended that he derived no salary and had no income subject to the judgments entered in favor of C.F. Trust and Atlantic Funding. Peterson instead testified that the BHG payments toward his personal expenses constituted repayments of prior loans that he had made to his corporations before the dates of the judgments. However, BHG's accountant testified — and the ledgers reflected — that many of BHG's payments toward Peterson's personal expenses were 'distributions,' not loan repayments. Moreover, no underlying

documentation supported Peterson's explanation for the disbursements or the companies' asserted obligations to Peterson, other than the checks and distributions themselves. Only in 1999 did Peterson generate 'promissory notes,' purportedly representing monies owed to him by his companies as repayment for the asserted loans.

"First Flight provided the bulk of the transfers to BHG during this time period. First Flight, the primary source of outside revenue for the Peterson entities, owned and operated a large commercial and industrial rental property called Top Flight Airpark. Beginning in 1992 and continuing through March 15, 1996, Barrie Peterson held a 98% limited partnership interest in First Flight, including a 2% interest held by Top Flight Airpark, Incorporated, a corporation wholly owned by him. Upland Group, an entity wholly owned by Peterson's elder son, Scott Peterson, held the remaining 2% general partnership interest.

"However, on March 15, 1996 – six weeks after C.F. Trust obtained a judgment against Peterson and two weeks after Atlantic Funding obtained its first charging order – Top Flight withdrew as 2% partner of First Flight, and Peterson transferred half of his resulting 98% partnership interest in First Flight to Scott Peterson. Upland Group, however, retained its 2% general partnership interest. Through this

6

transfer, Peterson purportedly surrendered legal control of First Flight to Scott Peterson, although Peterson himself continued to manage First Flight's day-to-day affairs.

"This transfer provided Peterson a second means of siphoning money from First Flight, other than through intercompany transfers to BHG, to pay his personal expenses. Peterson directed Scott Peterson to distribute First Flight's funds to himself, and then pay those distributions to Mrs. Peterson or to BHG, or use the distributions to pay the personal expenses of Peterson and Mrs. Peterson.  Thus, between March 15, 1996, and December 31, 1999, although First Flight did not directly distribute funds to Barrie Peterson, [First Flight] distributed more than $4.3 million to Scott Peterson.

"To justify these distributions, Peterson and Scott Peterson amended First Flight's partnership agreement to allow Scott Peterson, as the general partner, 'to approve any distributions to the limited partners' and 'to determine whether any part of the profits of the Partnership should be distributed to the limited partners.'  At trial, Peterson and Scott Peterson contended that this amendment to the partnership agreement extinguished the agreement's requirement of pro rata distributions to partners, although the amendment did not expressly alter its pro rata payout requirement.

7

Peterson also argued that money used by his son to pay Peterson's own personal expenses were repayments of loans Peterson had made to his respective companies."

## C.

The federal district court held that C.F. Trust and Atlantic Funding had "conclusively established the grounds necessary to support piercing the corporate veil in reverse." C.F. Trust, Inc. v. First Flight Ltd. P'ship, 140 F.Supp.2d 628, 645 (E.D. Va. 2001). The federal district court applied this Court's precedent for traditional veil piercing and required that C.F. Trust and Atlantic Funding prove (i) a "unity of interest and ownership" between Peterson and First Flight, and (ii) that Peterson "used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." Id. at 643 (quoting O'Hazza v. Executive Credit Corp., 246 Va. 111, 115, 431 S.E.2d 318, 320 (1993)). The federal district court concluded that First Flight was the alter ego of Barrie Peterson and "that the 'separate personalities of [First Flight and Barrie Peterson] no longer exist[ed].' " C.F. Trust, 140 F.Supp.2d at 644 (quoting O'Hazza, 246 Va. at 115, 431 S.E.2d at 321).

## III.

### A.

8

First Flight argues that this Court should not permit outsider reverse piercing of a limited partnership by a creditor of a limited partner. Responding, C.F. Trust and Atlantic Funding assert that this Court has permitted traditional veil piercing and that the same principles this Court applied in those instances would also permit reverse veil piercing in the present case.

We have stated that "[t]he proposition is elementary that a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it. This immunity of stockholders is a basic provision of statutory and common law and supports a vital economic policy underlying the whole corporate concept." Cheatle v. Rudd's Swimming Pool Supply Co., Inc., 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987); accord Beale v. Kappa Alpha Order, 192 Va. 382, 397, 64 S.E.2d 789, 797 (1951). The decision to ignore the separate existence of a corporate entity and impose personal liability upon shareholders for debts of the corporation is an extraordinary act to be taken only when necessary to promote justice. O'Hazza, 246 Va. at 115, 431 S.E.2d at 320; Cheatle, 234 Va. at 212, 360 S.E.2d at 831.

We have stated that "no single rule or criterion . . . can be applied to determine whether piercing the corporate veil is justified," O'Hazza, 246 Va. at 115, 431

S.E.2d at 320, and that the corporate entity will be disregarded and the veil pierced only if:

> "[T]he shareholder sought to be held personally liable has controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage. . . . Piercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice."

Greenberg v. Commonwealth, 255 Va. 594, 604, 499 S.E.2d 266, 272 (1998) (quoting O'Hazza, 246 Va. at 115, 431 S.E.2d at 320-21); accord Lewis Trucking Corp. v. Commonwealth, 207 Va. 23, 31, 147 S.E.2d 747, 753 (1966). The decision to disregard a corporate structure to impose personal liability is a fact-specific determination, and the factual circumstances surrounding the corporation and the questioned act must be closely scrutinized in each case. Greenberg, 255 Va. at 604, 499 S.E.2d at 272.

This Court has been very reluctant to permit veil piercing. We have consistently held, and we do not depart from our precedent, that only "an extraordinary exception" justifies disregarding the corporate entity and piercing the veil. Id.; Cheatle, 234 Va. at 212, 360 S.E.2d at 831; Beale, 192 Va. at 397, 64 S.E.2d at 797-98.

Traditionally, a litigant who seeks to pierce a veil requests that a court disregard the existence of a corporate entity so that the litigant can reach the assets of a corporate insider, usually a majority shareholder.  In a reverse piercing action, however, the claimant seeks to reach the assets of a corporation or some other business entity, as in this instance the assets of a limited partnership, to satisfy claims or a judgment obtained against a corporate insider.  This proceeding, often referred to as "outsider reverse piercing," is designed to achieve goals similar to those served by traditional corporate piercing proceedings.[1]

We conclude that there is no logical basis upon which to distinguish between a traditional veil piercing action and an outsider reverse piercing action.  In both instances, a claimant requests that a court disregard the normal protections accorded a corporate structure to prevent abuses of that structure.  Therefore, we hold that Virginia does recognize the concept of outsider reverse piercing and that this concept can be applied to a Virginia limited partnership. Indeed, limited partnerships, like corporations, have a legal existence separate from the partners in the limited partnership, and the structure of the statutorily-created

---

[1] See Gregory S. Crespi, The Reverse Pierce Doctrine: Applying Appropriate Standards, 16 J. Corp. L. 33 (1990).

11

limited partnership limits the potential liability of each limited partner. See Code § 50-73.24.

We note that the following jurisdictions also have approved the concept of reverse veil piercing. See, e.g., In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999); American Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997); Stoebner v. Lingenfelter, 115 F.3d 576, 579-80 (8th Cir. 1997); Towe Antique Ford Found. v. IRS, 999 F.2d 1387, 1390 (9th Cir. 1993); Permian Petroleum Co. v. Petroleos Mexicanos, 934 F.2d 635, 643 (5th Cir. 1991); Valley Fin., Inc. v. United States, 629 F.2d 162, 171-72 (D.C. Cir. 1980), cert. denied, 451 U.S. 1018 (1981); Litchfield Asset Mgmt. Corp. v. Howell, 799 A.2d 298, 309, 312 (Conn. App. Ct. 2002); Estudios, Proyectos e Inversiones de Centro America, S.A. v. Swiss Bank Corp. (Overseas) S.A., 507 So. 2d 1119, 1120-21 (Fla. Dist. Ct. App. 1987); Minich v. Gem State Developers, Inc., 591 P.2d 1078, 1084 (Idaho 1979); Lambert v. Farmers Bank, 519 N.E.2d 745, 748-49 (Ind. Ct. App. 1988); Central Nat'l Bank & Trust Co. of Des Moines v. Wagener, 183 N.W.2d 678, 682 (Iowa 1971); Roepke v. Western Nat'l Mut. Ins. Co., 302 N.W.2d 350, 352 (Minn. 1981); LFC Mktg. Group, Inc. v. Loomis, 8 P.3d 841, 846 (Nev. 2000); Winey v. Cutler, 678 A.2d 1261, 1262-63 (Vt. 1996); Olen v. Phelps, 546 N.W.2d 176, 181 (Wis. Ct. App. 1996). But see Floyd v. IRS, 151 F.3d 1295,

12

1298-99 (10th Cir. 1998); Scholes v. Lehmann, 56 F.3d 750, 758 (7th Cir.), cert. denied, 516 U.S. 1028 (1995); Sturtevant v. Town of Winthrop, 732 A.2d 264, 270 (Me. 1999).

B.

Virginia has adopted the Revised Uniform Limited Partnership Act, Code § 50-73.1, et seq. First Flight argues that the Act "specifies whether and when a limited partner may be held liable for the debts of the partnership, and thereby provides a statutory remedy analogous to the judicially-created remedy of piercing the corporate veil. . . . More importantly, the Act also provides a remedy for creditors of a limited partner by specifying the manner in which the assets of a limited partnership may be subjected to a creditor's claims." Continuing, First Flight claims that the Virginia Revised Uniform Limited Partnership Act prescribes the only methods that creditors may utilize to reach assets of a limited partnership.

We agree with First Flight that the Virginia Revised Uniform Limited Partnership Act prescribes certain statutory remedies for creditors of a limited partnership. For example, Code § 50-73.46, which is a part of the Act, permits a court to charge the partnership interest of a limited partner against whom a judgment has been entered. However, there is

13

simply no language in the Act that prohibits a court from piercing the veil of a limited partnership.

IV.

When determining whether reverse piercing of a limited partnership is appropriate, a court must consider the same factors summarized in Part III.A. of this opinion that this Court considers when determining whether traditional veil piercing should be permitted. Also, as we have stated in Part III.A. of this opinion, even though no single rule or criterion is dispositive, the litigant who seeks to disregard a limited partnership entity must show that the limited partnership sought to be pierced has been controlled or used by the debtor to evade a personal obligation, to perpetrate a fraud or a crime, to commit an injustice, or to gain an unfair advantage.

In Virginia, unlike in some states, the standards for veil piercing are very stringent, and piercing is an extraordinary measure that is permitted only in the most egregious circumstances, such as under the facts before this Court. The piercing of a veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and/or limited partnership and the individual no longer exist, and adherence to that separateness would create an injustice.

14

Additionally, a court considering reverse veil piercing must weigh the impact of such action upon innocent investors, in this instance, innocent limited partners or innocent general partners.[2] A court considering reverse veil piercing must also consider the impact of such an act upon innocent secured and unsecured creditors. The court must also consider the availability of other remedies the creditor may pursue.[3] And, a litigant who seeks reverse veil piercing must prove the necessary standards by clear and convincing evidence.

## V.

In view of the foregoing, we answer the first certified question in the affirmative, and we answer the second certified question by referring the United States Court of Appeals for the Fourth Circuit to Parts III.A. and IV. of this opinion.

<u>Certified question answered in the affirmative</u>.

---

[2] We note that based upon the facts contained within the order of certification and the federal district court's opinions, there are no innocent limited or general partners involved in this proceeding.

[3] Based upon the facts contained within the order of certification and the federal district court's opinions, C.F. Trust and Atlantic Funding exhausted all remedies available to them.